## WILSON et al. v. BRIDGFORTH.

[66 South. 524.]

1. APPEAL AND ERROR. *Review. Absence of ruling below. Deeds. Deposit for delivery after death. Validity. Reservation. Evidence.*
Where a motion is made in the lower court to exclude testimony, but the record fails to show that it was acted on by that court, the competency of such evidence will not be reviewed by the ' supreme court on appeal.

2. DEEDS. *Deposit for delivery after death. Validity.*
On the question whether the deposit of deeds with a depositary, was such as to vest title in the grantees, on delivery to them by the depositary of the deeds after grantor's death, it is not important what the depositary thought, or what he would have done, if the grantor had demanded return of the deeds, but the important question is, what he had a right to do.

3. SAME.
And the vesting of title in such case, does not depend simply on what the grantor intended to do, or what he thought he had done, but on what he did.

4. SAME.
A grantor need not deliver a deed to the grantee directly in order to vest title. If he does, the delivery must be in his lifetime. He may, however, deliver it to a depositary to be by him delivered to the grantee, and this last delivery will be good, though made after the grantor's death, provided always and only if, the depositary accepted in the capacity of agent of the grantee, and not the grantor, so that the grantor could never recall it. It must be left with the depositary without a reservation by the grantor, express or implied, of the right to retake it or otherwise control its use.

5. DEEDS. *Deposit for delivery after death. Restriction.*
Reservation by the grantor of the right to retake or otherwise control deeds delivered by him to a depositary, to be by him delivered to the grantee, after the grantor's death, will not be inferred from the fact that at the same time there was also deposited with the depositary, the grantor's will.

APPEAL from the chancery court of DeSoto county.

HON. D. M. KIMBROUGH, Chancellor.

Suit by David O. Bridgforth against D. E. Wilson, executors, and others. From a decree for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Cutrer & Johnston,* for appellant.

*Farley & Lauderdale* and *Julian C. Wilson,* for appellee.

SMITH, C. J., delivered the opinion of the court.

Mr. T. O. Bridgforth, who during his lifetime was the owner of a large estate consisting of both real and personal property situated in the states of Mississippi, Alabama, and Tennessee, died in the year 1909. By his will he directed that his executors should convert all of his property, both real and personal, that he had not conveyed or disposed of "by will, deed of gift, or otherwise, at or prior to" his death, into cash, and to divide the same among his children and certain of his grandchildren; appellee being one of the latter, designating specifically the share thereof each was to receive. Bridgforth appointed, as the executors of his wil, his two sons-in-law, W. B. Gray and D. E. Wilson, and Oliver Bridgforth, one of his grandsons. After Bridgforth's death, appellant D. E. Wilson, one of the executors, delivered to the grantees therein five deeds which had been signed and acknowledged by Mr. Bridgforth during his lifetime. One of these deeds conveyed a life estate in certain lands to appellee, with remainder to the issue of his body, and in default thereof to "the children" of the grantor. One conveyed certain land in fee simple to the widow and children of W. B. Bridgforth, a deceased son of the grantor. One, after reserving a life estate to the grantor, conveyed certain land to Mrs. Elizabeth Dickens, with re-

mainder over, in event "she should die without bodily
issue, . . .. to the other children of" the grantor. One
conveyed certain land in fee simple to Mrs. Mariah Wil-
son. One of them conveyed certain land in fee simple
to Mrs. Nellie Gray. Mrs. Dickens, Mrs. Wilson, and
Mrs. Gray were daughters of the grantor. The grantees
in these deeds are also beneficiaries under the will.

Appellee declined to accept the life estate conveyed by
the deed to him, and filed his bill in the court below for
the purpose among other things, of ascertaining what
the estate was of which T. O. Bridgforth died seised and
possessed, and of having it sold by the executors, and
the proceeds thereof disposed of by them in accordance
with the terms of the will; the executors themselves hav-
ing, on request, declined to file such a bill. The bill al-
leged, among other things, that these deeds never became
operative, for the reason that they were never intended
to be, and in fact were not, delivered by the grantor, and
that therefore the property therein described was a part
of his estate at the time of his death. The court below
so held, entered a decree accordingly; and upon applica-
tion of the appellants, defendants in the court below,
an appeal was granted to this court to settle the princi-
ples of the case.

The sole question presented to us by the record for de-
cision is: Was there a valid delivery of the deeds here-
inbefore referred to? An affirmative answer will require
a reversal of the decree granted in the court below, and
a negative answer will require an affirmance thereof.

It appears from the evidence that in August, 1909, Mr.
T. O. Bridgforth, who was then about eighty-three years
old, decided to arrange for the distribution of his prop-
erty after his death and to that end employed an attor-
ney by the name of Stokes, who prepared for him a will
and the deeds here in controversy. These deeds and the
will seem to have been drawn up in the office of D. E.
Wilson. At all events they were in his office when Stokes

and Bridgforth concluded their labors in the matter. This office was in the same building as that occupied by W. B. Gray Company, of which C. A. Worthy was a member, was separated only by a wall from the office of this company, in which wall there was a door, by means of which access from one office to the other was had. In this company's office there was an iron safe which either belonged to, or was under the control of, Mr. Worthy. Bridgforth occasionally left with Worthy private papers belonging to him, to be kept in this safe. Wilson was also accustomed to keep his private papers in this safe; he having a separate drawer for that purpose, to which he alone had the key. When Stokes and Bridgforth concluded their labors they, together with Wilson, went into Mr. Worthy's office. Up to this point it is not claimed that there is any material conflict in the testimony. According to Worthy, who was introduced in behalf of appellees, a sealed envelope, with "J. O. Bridgforth papers." or "J. O. Bridgforth's papers" written thereon, was handed to him by either Bridgforth or Wilson, but by which one he could not remember, with the request that he keep it until called for by whichever one of them handed it to him . This envelops contained these deeds, Bridgforth's will, and a paper, styled "'Statement of Advancements Made," and was placed by Worthy in the safe, not in the drawer where Wilson kept his papers, but in a different drawer, the key to which was in Worthy's possession. Mr. Bridgforth lived several months after this, during all of which time these papers remained in the possession of Worthy. After Bridgforth's death, they were called for and delivered to Wilson. Worthy admitted that shortly after Bridgforth's death, and after the delivery by him of the papers to Wilson, he (Worthy) told appellee and Mr. N. E. Wilroy that the papers had been left with him by Mr. Bridgforth, with the request that he keep them until called for by him. Appellee himself and Wilroy also testified in behalf of

appellee to this statement made them by Worthy, going somewhat more in detail as to what Worthy said than Worthy himself did. This evidence was practically all that was offered in behalf of appellee, necessary to be considered in this connection.

There appears in the record a motion to suppress appellee's and Wilroy's testimony. A memorandum on this motion indicates that it was never filed, and we fail to find in the record any order disposing of it. We are not, therefore, called upon to pass on the competency of the evidence thus objected to.

Worthy further testified that at the time he made this statement to these witnesses he thought it was true, but that, since thinking the matter over and discussing it with other parties he had become doubtful about it, and could not say whether the papers were given to him to be kept for Bridgforth or for Wilson. Had Worthy testified that he could not recall definitely for whom he was holding the papers, but at the time he made the statements to appellee and Wilroy he did know, and that whatever he then said was true, such evidence would have been, assuming its competency, of some value; but the evidence here falls far short of that, and proves nothing but that Worthy's recollection of the matter was so imperfect that his testimony could not be safely relied upon.

Appellant D. E. Wilson was introduced as a witness and testified substantially as follows: That, when Stokes and Bridgforth concluded their labors, they were in his (Wilson's) office, and that Bridgforth then handed him (Wilson) "a bundle of loose papers," and stated either, "Here are some papers I want you to keep for me and give to my children after my death;" or "Here are some papers I want you to keep and give my children after my death." He first testified that the first of these statements was made by Bridgforth, and later that the second statement was the one made by him, and finally that he could not say which of the statements was the one made;

that is, whether he used the words "for me" contained in the first statement, but omitted from the second. He (Wilson) took this bundle of papers, walked into Worthy's office, and asked him for an envelope. Worthy not having the envelope, he walked back into his own office, put the papers in an envelope, sealed it, wrote on them "J. O. Bridgforth's papers," carried them back into Worthy's office, handed them to Worthy, and asked him to put them in the safe and keep them for him (Wilson). Bridgforth and Stokes accompanied him (Wilson) into Worthy's office, and in the language of the witness: "At this period Mr. Bridgforth stated to Mr. Worthy: "These are some papers I am giving to Wilson to keep and give to my chidlren after my death.' Upon correction by Mr. Stokes, he called the papers 'deeds.' Mr. Worthy then took the papers and placed them in his safe."

Wilson seems not to have been definitely advised by Stokes and Bridgforth of the disposition that Bridgforth was making of his estate by these papers, but he knew generally what they were doing, and that Mr. Bridgforth was arranging for the division of his estate among his children and grandchildren. Bridgforth did not, thereafter, call upon Wilson for them, nor was there any further conversation between them relative thereto. They remained in Worthy's keeping until after Bridgforth's death, and were then, as hereinbefore stated, delivered by Worthy to Wilson upon being called for by him. During his examination Wilson was asked this question: "For whom were you keeping these papers during Mr. Bridgforth's lifetime?" And his answer was: "I will be bound to answer that I thought I was keeping these papers for Mr. Bridgforth." Again he said "that Mr. Bridgforth could have gotten these papers from me if he had demanded them." He was then asked whether he "felt under any obligations to return the papers to him (meaning Bridgforth) upon his request," and he an-

swered, "No, sir; no legal obligation; just the respect and feeling I had for him."

In passing we will say that this evidence of what Wilson thought and of what he would have done with the deeds is of very little value, for we are concerned here only with what he had the right to do with them.

W. B. Gray, one of appelant's witnesses, was asked this question: "These deeds were executed on or about the 28th of August, 1909. I will ask you to state what, if anything, Mr. Bridgforth said to you about having executed these deeds, and what he had done with them after he executed them." To which he answered: "I had a conversation with Mr. Bridgforth in Memphis, at my office, on the 1st of December, I think, in regard to his lands and his property, and he told me that he had made proper provisions, had looked after all of his heirs, and had made deeds and a will; that I need not have any worry or anticipate any trouble about his financial affairs; that he had prepared for the future; something to that effect." This witness also testified that in either 1908 or 1909 Bridgforth told him that he was going to give the Norris place to Mrs. Wilson, and that he was going to divide certain other of his lands among his three daughters.

Bridgforth made a trip to Alabama after the delivery of these papers to Wilson, and while there an offer to purchase some of the land which he there owned, and which was included in one of these deeds, was made to him, which he declined. The witness Witt, who testified to this fact, was asked this question: "What, among other things that you recall, led to his making a specific statement of that sort to you?" To which he answered: "I tried to buy certain of the lands, and he told me: 'No, I can't sell them now. I have deeded the lands to'—he called them 'Mariah, Lizzie, and Nellie.' And he said: 'The deeds are in Mr. Wilson's possession to be given to them. In other words, I have wound up my own estate to keep it out of the courts.'"

In the testimony of T. J. Dean, who was one of the subscribing witnesses to the will, appears the following questions and answers:

"State when these conversations took place, and then state the subject-matter of the conversations. Well, I can't give you the dates, but he talked to me in reference to making his will; and then after he had made his will he talked to me about his property; before making the will of the disposition and after the will he told me he had disposed, or rather divided up, his property. . . . Well, he had told me several times, often, I will say, before he made his will, that he wanted to convert what he had into land, and that he wanted to give the land to the children, so as the heirs would not spend it. That is one thing he said in reference to the disposition of his property. . . . Now, after the date of the will, you had further conversations with him? After that date of the will he came into my office and talked about it. He said: 'I feel a great deal better. I have divided my property among my heirs, and my mind is now relieved.' That is all he said to me that I recall now."

Another witness, J. L. Humphreys, testified "that in the fall of 1909" he offered to purchase some of the land in Mississippi from Bridgforth, and told him that he wanted to build a house on it; but Bridgforth declined, saying: "I would build the house, but I won't sell you the land,' giving as his reason that 'I have made my will.' " A little later on in his examination he was asked this question: "And that was the reason he assigned that he could not sell it." And to which he answered: "Yes, that he could not sell. He told me that was the reason that he had made his deeds and his will, and I did not furthermore insist on him to sell it."

Item 4 of the will is as follows:

"It is my will and bequest that my executors herein do first proceed to collect all debts that are now outstading and due me or due me prior or at the time of my death

and to sell, after first giving notice of the time, terms and place of sale by three notices in writing posted in three public places, at public outcry for cash or private sale, for cash or on short time, taking well-secured notes for the payments of such property as they may sell on time, sell as so directed aforesaid all and every kind of property consisting of real estate, personal and mixed that I may die seised and possessed of, that has not been conveyed or disposed by me by will, deed of gift or otherwise at or prior to my death and being in the states of Mississippi, Alabama and Tennessee or elsewhere they may find it, except as aforesaid any and all personal, real and mixed property that has been at or prior to my death disposed of or conveyed by me by deed of gift or otherwise which shall be exempt from said sale, as herein directed by me to be made by my said executors.''

Item 5 directed that the money coming into the hands of the executors from the collection of all debts due the testator from the sale of all of his property, after the payment of the testator's debts and certain other items therein mentioned, should be distributed:

''To my grandson, David O. Bridgforth, two ninths of the net proceeds or the net cash proceeds of said sale. To the widow and heirs of W. B. Bridgforth, deceased, two-ninths of said net cash proceeds of said sale said two-ninths to be equally divided between the said widow and heirs of said W. B. Bridgforth, deceased, each to take share and share alike. To Mrs. Mariah Wilson two-ninths of the net cash proceeds of said sale. To Mrs. Elizabeth Dickens one-ninth of the net cash proceeds of said sale and the cause or reason for her, the said Mrs. Dickens only getting one-ninth herein, this distribution is occasioned by prior advancements having been made by me to her. To Mrs. Nellie Gray two-ninths of the net cash proceeds of said sale.''

Item 7 is in part as follows:

''It is my further desire that at any time after my death that any of my children or grandchildren make any

complaint as to the way I have distributed or divided up my property among them by deed of gift, will or otherwise, that the bequest or devises or gifts that I have made or do hereafter make to said legatees or donees by will, deed or gift or otherwise be declared null and void as to them and that my said executors make an equal distribution of said bequests, devises, legacies, or gifts, among my other children that have not made such complaint or tried to contest or have set aside any deed of gift or will that I may now make or have heretofore made or may hereafter make.''

The statements of advancements made set forth various sums of money advanced by the testator to certain of his children and grandchildren, and recited that:

''I am desirous of making this statement showing how said advancements have been made by me and to whom made and that said advancements influenced me in the general distribution of my property.''

And further that:

''My object and purpose in making this statement is that my children may be informed as to how I made the estimate as to their proportionate shares in the general distribution of my worldly effects among them which I have heretofore made or shall hereafter make to them by deeds of gift, will or otherwise, and it is and has been the desire of my heart that they should have satisfactory shares in my worldly effects, that is to be satisfied alike, and it is my further desire that this statement be held in trust by my son-in-law, D. E. Wilson, until after my death and that a copy of the same be given or delivered by him to each of my children and the grandchild whose name is mentioned herein, and a copy to Oliver Bridgforth, my grandson, and one of the heirs and representations of W. B. Bridgforth, deceased, whose name is not mentioned herein so they may each be fully advised as to the contents of this statement and the facts as set forth by me herein.''

It is beyond question that, when Mr. T. O. Bridgforth
made his will and executed these deeds, he intended that
his estate, after his death, should be divided among his
children and grandchildren in accordance therewith.   It
seems also to be beyond question that he died thinking
ₐat he had provided for such a distribution.   The ques-
tion, however, for our decision is, not simply what he
intended to do or what he thought he had done, but what
he in fact did.   Whether his intention to so divide his
estate can now be carried out depends upon whether the
deeds he executed were in fact delivered.

There is no contention on the part of appellee that the
delivery of the deeds, in order to be effectual, must have
been made to the grantees in person.   Delivery of a deed
to a third person, though such person had not been pre-
viously authorized by the grantee therein to accept it, is,
under certain circumstances, effectual if the grantee af-
terwards accepts it.   The rule governing the delivery of
a deed to a third person for the grantee therein cannot
be better stated than was done in *Hall* v. *Waddill,* 78
Miss. at page 26, 27 So. at page 937, where the court said:

"A grantor need not deliver to the grantee directly.
If he does, the delivery must be in his lifetime.   He may,
however, deliver it to a depositary to be by him delivered
to the grantee, and this last delivery will be good, though
made after grantor's death, provided always, and only
if, the depositary accepted in the capacity of agent of
the grantee, not the grantor, so that the grantor could
neved recall it.   It 'must be left with the depositary with-
out a reservation by the grantor, express or implied, of
the right to retake it or otherwise control its use.' "

To which may be added that all that is necessary in or-
der for the depositary to become the agent of the grantee
is for the deed to be deposited with him for delivery to
the grantee "without a reservation by the grantor, ex-
press or implied, of the right to retake it or otherwise
control its use," provided the grantee afterwards ratifies

the appointment of the depositary as his agent by accepting the deed.

No special form or ceremony is necessary in order to evidence such an intention on the part of the grantor. It may be by acts or words, or both, which indicate that the grantor intends that the deed shall become operative, and from which no inference can be drawn that he intended to reserve to himself any control over it.

Let us now examine the evidence in the light of this rule, and see whether or not the court below was warranted in holding there was no valid delivery of the deeds. There is no real conflict between the evidence of Worthy that these papers were handed to him by either Bridgforth or Wilson, but which one he did not remember, to be kept until called for by the one handing them to him, and the evidence of Wilson that he handed the papers to Worthy with the request that he keep them for him (Wilson); neither is there anything in the evidence, other than the statements made by Worthy to appellee and Wilroy, and the fact that when the papers were put in the safe they were kept by Worthy separate from Wilson's papers, to indicate that Wilson's testimony on this point was not true. This evidence, however, is far too weak to amount, under any circumstances, to proof, or to overthrow that of Wilson which is consistent with all the other facts and circumstances in the case.

Viewing the evidence most strongly for appellee, we will assume that Bridgforth said to Wilson, when he handed him the papers, "Here are some papers I want you to keep for me, and give to my children after my death." The evidence then discloses that an old gentleman, nearing the end of his life, desiring to provide a plan by which his property could be most conveniently divided among his children, and acting with the assistance, and probably under the advice, of an attorney, executed deeds conveying his land, or the greater part thereof, to those to whom he wished to give it, and a will

providing for the distribution of the remainder of his property. As he did not desire these deeds to take effect during his lifetime, instead of delivering them at once to the grantees therein, he deposited them with one of his sons-in-law with the request that he deliver them, after his death, to his children; and under the advice of his attorney he was particular, in making this delivery to his son-in-law, to refer to them as deeds. This delivery of the deeds was certainly unaccompanied by an express reservation on the part of the grantor of the right to retake or otherwise control them; and we fail to find anything in the evidence from which such a reservation can be inferred, except the mere fact that the will was deposited with Wilson along with the deeds. It is true that he had the right to revoke this will, had he thereafter desired so to do, but it seems clear that the papers which he particularly desired Wilson to keep and deliver to his children were the deeds, for his attention was specifically called thereto by his attorney, and he immediately qualified his first statement and referred to the papers, which he desired Wilson to keep and deliver to his children, as deeds. That Bridgforth's attention was called, by his attorney, to the fact that he had not specifically designated what papers Wilson was to keep and deliver to his children is not without significance. This whole matter was supervised, or at least was prominently participated in, by this attorney, and this correction made by him, in the language used by the grantor in referring to what papers he was depositing with Wilson, seems to indicate that he was desirous that nothing should be said or done that would cast a doubt upon the intention with which these deeds were deposited. Moreover, the will itself expressly refers to the fact that he had made deeds of gift to his children and grandchildren, and provides what penalty shall be visited upon that one, of them who should express dissatisfaction therewith; and in the statement of advances he advises his children

and grandchildren how he arrived at their proportionate shares in the distribution of his property among them by means of ''deeds of gift, will, or otherwise.'' In addition, he, on several occasions, clearly indicated that he had effectually disposed of his property by depositing these deeds with Wilson, as will appear from an examination of the testimony of the witnesses Gray, Witt, Dean, and Humphreys, hereinbefore set out.

It is true, as hereinbefore stated, that we are called upon to determine, not what Bridgforth thought he had done, but what he in fact did. It is manifest, however, that he in fact did what he evidently thought he had done; that is, he deposited the deeds with Wilson under such circumstances as would vest the title in the grantees to the land therein conveyed, when delivered to them after his death. In reaching this conclusion we have left out of view, and have not read, the testimony of appellants' witnesses J. O. Bridgforth, Mrs. Nellie Gray, and Mrs. Mariah Wilson, whose depositions were suppressed in the court below, and therefore express no opinion on whether or not the court erred in suppressing them.

The rule governing the question here in controversy has been so well settled by former decisions of this court that we have not considered it necessary to refer to the decisions of courts of other states, a large number of which will be found collated in the note to *Munro* v. *Bowles*, 54 L. R. A. 865.

*Reversed and remanded.*