## Adam Baumann, Appellee, v. Amos T. Hutchinson, Appellant.

Filed December 9, 1932.   No. 28142.

*Rosewater, Mecham, Burton, Hasselquist & Chew,* for appellant.

*Lawrence W. Rice* and *E. T. Hayes, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Eberly, Day and Paine, JJ.

Good, J.

This is a personal injury action in which plaintiff re-covered judgment, and defendant has appealed.

The errors relied on for reversal are that the evidence is insufficient to sustain the verdict, and the giving and refusing of instructions to the jury. The record reflects the following facts:

Plaintiff was thrown from a ladder and received the injuries of which he complains. He was standing on the ladder, washing a second-story window of a business building in the city of Norfolk. The building abutted on the south side of a paved public alley, 16 feet in width. The ladder was placed in the alley, the upper end against, and the lower end about four feet from, the building. The alley extends east and west, and on the north side thereof, opposite the building on which plaintiff was working, was another business building, known as the Killian building. The west part of the Killian building abutted on the north side of the alley; the eastern part of the building lacked about 25 feet of reaching to the alley.

At about 9:30 a. m., on May 23, 1930, defendant, whose automobile had been parked in the rear of the east part of the Killian building, got into his car and backed it southwesterly into the alley and against the ladder on which plaintiff was working, knocking the ladder down and precipitating plaintiff to the pavement. Plaintiff sustained a fracture of the radius of the right arm; a fracture of the os calcis bone of the left foot, and also a

fracture of the tubercle of the astragalus bone in the same foot. He also received injuries to his back which at the time were not believed by his physician to be serious. The evidence on behalf of plaintiff tends to prove that some months later it was discovered that he had sustained a compressed fracture of the twelfth dorsal vertebra, and a fracture of the processes of the first lumbar vertebra. The evidence on behalf of defendant respecting the injuries to the vertebræ conflicts sharply with that on behalf of plaintiff.

Immediately after the injuries plaintiff was removed to a hospital in Norfolk, where he was put under an anæsthetic, and the then-known fractured bones were set, a splint being placed on the right arm and a cast on the left foot and leg. Morphine was also administered to him hypodermically, but the precise time when it was administered is not disclosed. On the following day defendant, together with the local agent and adjuster, respectively, of defendant's insurance carrier, called upon plaintiff at the hospital and discussed with him a settlement for his injuries and the damages sustained thereby. At the time of this conversation plaintiff was not represented by counsel, or by any relative or friend of the family. Near the close of the conversation, plaintiff's wife and children came into his room at the hospital. Very little was said after she entered. Apparently there was a statement made that the three men were going to see plaintiff's surgeon. This they did, and they had a conference with the surgeon, who exhibited to them the X-ray pictures, taken the day before, of the injured parts of plaintiff's body. Some of these had been taken before and some after the fractures were reduced. The surgeon also informed the three men of the nature of the then-known injuries, and that plaintiff would probably be disabled for a year or more. About an hour later they returned to the hospital, at which time the plaintiff's wife and children had departed, and took up with plaintiff the question of a settlement of any claim which he might

have for his injuries. They informed him that the doctor's bill would be about $200 and the hospital bill about $20, and that they were willing to give plaintiff $400, as a settlement of any claim he might have. Thereupon releases were drawn and presented to plaintiff for his signature. He was then lying in a hospital bed, with his right hand in a splint and his left foot and ankle in a cast. They requested his signature, and he informed them that he could not write because of his injured right hand. It was suggested that he could put his thumb print upon the releases which would answer for his signature. Thereupon an ink pad was procured; his left thumb was inked, and the releases were placed on a paper or magazine and held for him while he placed his thumb thereon.

The evidence on behalf of defendant is to the effect that plaintiff voluntarily placed his thumb upon the ink pad and also voluntarily placed it upon the releases. Evidence on behalf of plaintiff tends to show that he had to have assistance in putting his thumb upon the pad, and that he was assisted in putting his thumb print upon the releases. Evidence on behalf of plaintiff tends to show that defendant and the insurance adjuster and agent did not fully and correctly inform the plaintiff with respect to his injuries and give to him the full information which they had received from plaintiff's doctor, but made it appear that his injuries were much less, and that his disability would be of much shorter duration than as told them by the doctor. The evidence on behalf of plaintiff tends to prove that at the time of the first conversation and the second conversation, an hour later when the releases were supposedly executed, plaintiff did not desire to talk and appeared to be somewhat dull or stupid; whether from the effect of the shock or the morphine, or a combination of them, is not fully disclosed. After the thumb prints were placed upon the releases, a check for $400 was given to plaintiff. Plaintiff never cashed or indorsed the check, and later he took the check to the office of the local agent, and gave it to him, telling him

that he was not satisfied with the settlement. Two days later this suit was begun, and three or four days later the agent returned the check to plaintiff in a registered letter, and it remained in his possession until the trial of this cause in the district court, when it was tendered back to defendant.

In *Vandervert v. Robey*, 118 Neb. 395, it was held: "Backing out from private property onto a public highway is an operation demanding a high degree of skill and caution to avoid danger or injury to any person on the highway or collision with any vehicle thereon, and one engaged in such operation must use greater care than would be required of one driving along the highway.

"The duty of the driver of a vehicle, about to enter upon the highway from a private drive, to look for vehicles approaching on the highway implies the duty to see what was in plain sight, unless some reasonable excuse for not seeing is shown."

In *Taulborg v. Andresen*, 119 Neb. 273, it was held: "The operator of a motor vehicle in backing the same onto a street or highway must look backward, not only before he begins his operation, but also while he is in the act of backing, and must give a signal of his intention to back when a reasonable necessity for it exists, in order that he may not collide with or injure those lawfully using such street or highway."

The record discloses that defendant did not give any warning of his intention to back into the alley; nor did he keep a lookout while backing; because thereof, he failed to see plaintiff or the ladder upon which he was standing. The evidence is such as to warrant a finding of negligence on the part of defendant.

Defendant charges plaintiff with contributory negligence in failing to keep a lookout or to place signals, and in failing to secure himself in some manner from falling when the ladder was knocked from under him. We are of the opinion that no negligence on the part of plaintiff has been shown. A flag would not have protected plain-

tiff, because defendant did not look. Had he looked, he would have seen the ladder and plaintiff standing thereon. It is not negligence for one, without securing himself by straps to the building, to work on a ladder resting securely on the pavement in a public alley, and leaning against a solid building. There are other alleged acts of contributory negligence on the part of plaintiff; in fact, almost every conceivable act that the ingenuity of counsel could suggest, but we find no evidence in the record that would justify a finding that plaintiff was guilty of any negligence that contributed to his injury.

It follows that the case was properly one for submission to the jury, and the evidence is such as to warrant a finding for plaintiff, unless he is barred therefrom by the releases which were executed on the day after his injury.

Defendant seeks to justify the meager sum that was paid, on the theory that defendant denied any liability, and that it was a compromise settlement of a disputed claim. First, it appears that plaintiff had made no claim, had asserted no cause of action against defendant; but defendant and the insurance agent and adjuster, on their own volition, sought plaintiff in the hospital very soon after his injuries, to obtain a very prompt settlement, evidently before plaintiff could have an opportunity to consult with counsel or be properly advised. The promptness with which plaintiff was sought out for a speedy settlement, while he was in a disabled condition and still suffering from shock, and without the advice of counsel or the knowledge of friends or relatives, is significant of a great desire on the part of the insurance company to secure an advantageous settlement for it under circumstances which cannot be commended. It is significant that, while these men were in the room with plaintiff and after his wife came in, they made no mention of any settlement in her presence, and it is also significant that plaintiff was in such a physical condition that he did not even mention the matter to his wife.

Evidence on behalf of plaintiff tends to show that at the time the releases were executed he was led to believe that it was as a settlement only for his hospital and doctor's bills, and "for the time being." It is true, this is controverted by evidence on behalf of defendant. Plaintiff did not read the releases, nor were they read to him. There is a conflict in the evidence as to whether the contents of the instruments were fairly interpreted to the plaintiff either by defendant or by the insurance agent or adjuster.

In an annotation appearing in 48 A. L. R. 1462 *et seq.*, the subject of avoiding release of claims for personal injuries is exhaustively considered. At page 1486 it is said: "It is well settled that a release of a claim for personal injuries may be avoided if it is executed in reliance on misrepresentations as to the nature or extent of the injuries, amounting to fraud on the part of the releasee, its agent, or physician. Where the professional opinion relied on to avoid a release is not given directly by the physician to the patient, but is communicated to him by a third person, as a claim agent of the releasee, it is the duty of the agent to repeat the opinion with entire correctness; and if the person responsible for the injury, or the agent, falsely represents to the releasor what a physician or surgeon thinks or has said about his injuries, it is a fraud which will justify the rescission of a release executed on such false statement." The text to the note is supported by numerous authorities, and we deem it sound law.

In *Perry v. Omaha Electric Light & Power Co.*, 99 Neb. 730, it was held: "When the amount received in settlement is grossly inadequate to compensate for the injuries sustained, that fact may be considered, with other evidence, as tending to show unfair practice, that the party has been overreached, and that the minds of the parties never met in the consummation of a valid contract."

In the instant case, while the settlement was for $400, the jury awarded plaintiff $5,000. If plaintiff was en-

titled to recover, it is clear that the amount given in settlement was grossly inadequate. Under the facts presented, we are satisfied that there was sufficient evidence of fraud to require the submission of that question to the jury. The finding of the jury on conflicting evidence will not be disturbed unless clearly wrong. We conclude that there is ample evidence to sustain the verdict if the cause was properly submitted to the jury.

With respect to the alleged errors in refusal of instructions, it may be noted that defendant requested the giving of 34 separate instructions, and requested submission to the jury of 14 special interrogatories. The court gave to the jury 25 instructions, 5 of them from defendant's requests, and also submitted 12 of the special interrogatories requested by defendant. The real issues that should have been properly submitted to the jury were not numerous and were comparatively simple. It may be observed that many of the requested instructions embodied the same propositions, but couched in different language.

Defendant makes separate complaint concerning the refusal of the court to give 14 of his requested instructions. A number of these instructions state correct principles of law, and some of them are applicable to the issues submitted to the jury. However, from a careful examination of this mass of instructions, we are satisfied that the court included in its charge to the jury a proper instruction on every issue that should have been submitted to the jury. The substance of most of defendant's requested instructions was included in the court's charge to the jury. To set out and discuss each of the instructions would unduly extend this opinion, and we think would serve no useful purpose. It is not error for the court to refuse defendant's request for additional instructions, where it has, on its own motion, fairly and fully instructed the jury on defendant's theory of the case. *Blado v. Draper,* 89 Neb. 787.

Defendant insists that the court erred in giving instruc-

tion No. 9 on its own motion. That instruction informed the jury that the burden was upon plaintiff to prove his cause of action by a preponderance of the evidence; that if he has done so he is entitled to recover, and that if he has failed to do so the jury should find for the defendant, and the term "burden of proof" is defined therein. The ground of the complaint is that in this instruction the court failed to inform the jury that plaintiff must establish that the release pleaded was procured by fraud or mistake. In other instructions this phase of the case was fully and completely given to the jury, with the information that, unless the jury found from a preponderance of the evidence that the release was procured by mutual mistake *and* fraud, plaintiff could not recover. The jury, in response to special interrogatories, found specifically that defendant and his representatives made representations to plaintiff at the time the alleged settlement was made and prior to the execution of the release, and further answered to the effect that defendant and his representatives advised plaintiff incorrectly as to the information given them by plaintiff's physician. Under the circumstances, it is clear that the jury were not misled by the instruction. In fact, the instruction was more favorable to defendant than he was entitled to, in that it required the jury to find that the release was procured both by fraud and by mutual mistake.

Complaint is also made of an excerpt from instruction No. 10 given by the court. Taking the instruction as a whole, it does not appear that there was anything therein that was or could have been prejudicial to defendant.

Defendant assigns error in the giving of instruction No. 12 on the court's own motion. We have carefully examined the instruction and find no erroneous statement of law contained therein; nor is any pointed out in the briefs of defendant.

No error prejudicial to defendant has been found. The judgment is

AFFIRMED.