## WESTERN MARYLAND DAIRY CORPORATION ET AL *v.* PATRICIA BROWN

[Nos. 2, 3, October Term, 1935.]

*Decided November 21st, 1935.*

The causes were argued before BOND, C. J., URNER, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*L. Wethered Barroll and Marbury, Gosnell & Williams,* submitting on brief, for the Western Maryland Dairy Corporation and Gustav B. Zeller, appellants.

*H. Beale Rollins* and *F. Gray Goudy,* for Max Rubenstein and the Peerless Cab, Inc., appellants.

*Joseph Sherbow* and *Nathan Posner,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

We have here two appeals in one record in a case wherein a judgment was recovered against the owners of two motor vehicles and their respective drivers, from which they all appeal. It is the same accident which was the subject of the case of *Zeller v. Mayson*, 168 Md. 663, 179 A. 179. In that case the questions decided were the legal sufficiency of the evidence of the defendant's negligence, and whether the plaintiff, Sylvia Mayson, was guilty of such contributory negligence as a matter of law as to disentitle her to recover. On both of these questions this court held for the plaintiff, and the judgment of the trial court was affirmed. The plaintiff (appellee), Mrs. Walter Brown, also known as Patricia Lamonte, and Sylvia Mayson were passengers in a taxicab of the Peerless Cab, Inc., driven by Max Rubinstein, when it collided with a truck of the Western Maryland Dairy Corporation, driven by Gustav B. Zeller, at the intersection of Baltimore and Liberty Streets in Baltimore. Of course, there was actually the same set of facts in both cases, aside from the difference in the nature and extent of the injuries of the respective plaintiffs, and, the recital of them in both records being substantially the same, there is no need or excuse to here repeat the facts of the accident already stated in the opinion in *Zeller v. Mayson*, at the last term of this court. On the authority of the decision in that case, we must hold that there was legally sufficient evidence of negligence of all the defendants to take the case to the jury, and that the plaintiff was not guilty of such contributory negligence as to entitle the defendants to a verdict as a matter of law.

In the case of Mrs. Brown, there was an important issue not present in the *Mayson* case, and that was the effect of a release signed by the plaintiff here an hour or two after the accident, in the Mercy Hospital at Baltimore. In addition to the general issue plea, Max Rubinstein and Peerless Cab, Inc., pleaded a release to them

from the plaintiff. Gustav B. Zeller and the Western Maryland Dairy Corporation pleaded that the plaintiff had, after the accident, given a general release to the Peerless Cab, Inc., which appeared from the declaration to have been a joint tort-feasor with the other defendants, and that it was thereby also released. *Lanasa v. Beggs*, 159 Md. 311, 151 A. 21; *Elling v. Travers*, 162 Md. 597, 160 A. 789. The plaintiff's replication to the pleas of release was that the release was procured by fraud.

It appears from the evidence that, immediately after the collision, Mrs. Brown, the plaintiff in this case, was taken to the Maryland University Hospital, and her companion, Sylvia Mayson, to the Mercy Hospital. She was rendered unconscious by the accident, but was conscious when she was treated and bandaged at the hospital. Her injuries did not require her to remain at the hospital, though she was under the care of a physician for three months before she was able to resume her occupation. In about an hour after the accident she left the University Hospital and was driven to the Mercy Hospital whither, she learned, Miss Mayson had been taken. She did not know who took her there. When she arrived at the Mercy Hospital, Miss Mayson was in the accident room. Mrs. Brown waited in the reception room for news of her friend, who was more seriously injured. A few minutes after Mrs. Brown's arrival at the Mercy Hospital, a young man whom she did not know, but who turned out to be Paul Kaiss, a claim agent for Peerless Cab's insurer, came into the room where she was. Her story of what happened is: "Well, I was there for a few minutes and some man came over to me and started bothering me to sign some kind of a paper. I refused him two or three times and he kept insisting, and I heard Miss Mayson crying in the next room, where she was being treated, and I was in such great pain that evidently I must have signed the paper because they let me alone." "The only thing he kept saying was 'sign this

paper, something for your benefit.' I don't remember what it was." She signed two copies of a release from liability to the Peerless Cab, Inc., in consideration of $5, and a statement of the accident, and indorsed a check for $5 from Markel Service, Inc., drawn by Kaiss, who testified that it was cashed, at his request, at the hospital, by a cabman. As to her condition at the time, she said, "I couldn't stop crying for one thing, and I was very shaky. I felt as though I was going to faint every minute."

Paul Kaiss testified for the defendant Peerless Cab, Inc., that the first person he interviewed was "Miss Lamonte," from whom he obtained a statement of the accident and collision. "She gave me the information and I wrote it down and she looked it over and signed it." "After I had received the statement I saw it was not a case of liability, so far as I was concerned." In spite of this conclusion he "spoke to her about settlement in the matter," saying it was their custom to make some sort of a settlement regardless of responsibility, to save the cost of defense of suit. He said "she asked me for, I think, twenty-five dollars. I told her I could not pay very much because it wasn't our fault, and I finally offered five dollars, which she accepted, and I drew up a set of releases and she signed them." He stated in the releases that she had been treated at the Mercy Hospital, a fact which he assumed because he found her there. Asked by the court whether she read the release before signing it, Kaiss said, "She looked at it," then asked whether he had read it to her, said he had not. If she had read it, she would have seen that the apparent releasee was the Peerless Cab, Inc., and that it erroneously stated the hospiital to which she had been taken. He said it took about fifteen minutes to interview her, get her statement, fill in two forms of release, and effect a settlement. He was so eager to obtain releases that as soon as he had finished with the plaintiff, he made persistent efforts to get into the room where Miss Mayson

was being attended to, and it was only because of her condition that he failed to interview her; all of which is evidence to show the eagerness of Kaiss to secure releases and the speed with which he worked. The general rule is that one is bound by what he or she signs, and is presumed to know the contents, nature, and consequences of a contract so signed, but, when such a paper as is here in evidence is attacked on the ground of fraud in its execution, the court is entitled to hear the facts and circumstances under which it was executed, otherwise fraud might be an unascertainable fact. There is evidence here from which the jury might conclude that the plaintiff was so rushed by the insurer's agent that she was not given time to read what she was signing, nor to comprehend what she was doing.

When a plea of release is impeached, the burden is on the plaintiff to show by legally sufficient evidence that the release lacked genuineness, or was procured by fraud, duress, or imposition amounting to fraud. *Hammond v. New York, P. & N. R. Co.*, 128 Md. 442, 97 A. 1011. A mere scintilla of evidence will not be sufficient. As said by Justice Sharswood in *Pennsylvania R. Co. v. Shay*, 82 Pa. 198, many times cited with approval by this court, "It has been more than once held that it is error to submit a question of fraud to the jury upon slight parol evidence to overturn a written instrument. The evidence of fraud must be clear, precise, and indubitable; otherwise it should be withdrawn from the jury." *Aetna Casualty & Surety Co. v. State, use of Hendrichs*, 162 Md. 49, 57, 158 A. 45.

The plaintiff has cited several cases to the effect that the payment of a nominal or insignificant sum of money in settlement of serious injuries is of itself some evidence of fraud. The rule in this state, however, as stated in 1 *Poe, Pl. & Pr.*, sec. 653, is: "Unless impeached for fraud or duress or traversed as not genuine this defense will be complete and the plaintiff will not be heard to allege or allowed to prove that it was without consideration or

that the amount paid was in reality not all that was due." *Hammond v. New York, P. & N. R. Co.,* 128 Md. 442, 447, 97 A. 1011, and cases there cited. Nor is carelessness in the execution of a release an excuse. *Spitze v. Balto. & O. R. Co.,* 75 Md. 162, 23 A. 307. In this court it has been uniformly held that the facts and circumstances attending the signing of a release, or the payment of the consideration, as the case may be, are controlling.

The case of *Hammond v. New York, P. & N. R. Co., supra,* is an illustration of a case wherein the consideration paid was inadequate compensation for the injuries sustained and expenses incurred, but without legally sufficient evidence that fraud was practiced or duress imposed in procuring the release. In *Spitze v. Balto. & O. R. Co., supra,* the plaintiff's complaint of the insufficiency of the consideration was held to be due to his carelessness in giving the release, and not to the fraud, imposition, or misconduct of the defendant or its agents. In neither case was there held to be an implication of fraud from the inadequacy of the consideration paid for the release.

The facts detailed in the present record, attending the execution of the release by the plaintiff, are rather meager, but the evidence is sufficient to convince us that there was legally sufficient evidence of such want of understanding on the part of the plaintiff as to cast suspicion upon the validity of this release, of the kind characterized in some cases as "midnight releases." She had been in a collision about four o'clock in the morning, an hour or so before, in which she was rendered unconscious. In that condition she was rushed to a nearby hospital, where she was promptly treated. When the physician finished, he told her to go home. She was exercised about her companion, Miss Mayson, and instead of going home, asked to be taken to her, which was done. She had no sooner arrived at the Mercy Hospital than the insurance agent or investigator, Kaiss,

accosted her for a statement, on the strength or result of which he declared the Peerless Cab not liable, and then secured from her a release, which might be useful in case the defendant changed her mind, should realize that the cab company was negligent, or she should be so advised. She had a right to believe that the insignificant sum paid was no more than a donation, in view of the agent's representation that there was no liability. In addition to the evidence that she was nervous and excited, the physician who attended her after the accident said that the next day, when he called to see her, "Her chief complaint was nervousness, with pain in her right and left limb and back." The physician at the University Hospital, who gave her first aid, said on direct examination, "She was rather excited, but not unduly so." Asked on cross-examination, "You don't mean, when you say that her mental condition was satisfactory, that she was in any condition to sign any kind of a legal paper. Do you?" He said, "I can't say that."

With these facts and under these circumstances, we can reach no other conclusion or impression than that there was legally sufficient evidence that she was hurried into signing a release without an opportunity to appreciate and understand the nature, effect, and consequences of her act, possibly influenced by the declaration of the agent, Kaiss, that there was no liability of the cab company to release.

What was said in *Mensforth v. Chicago Brass Co.*, 142 Wis. 546, 549, 126 N. W. 41, 43, 512, is pertinent here, and that is: "No inquiry was made as to the extent of the injuries and no pretense to settle for them, but, on the contrary, the officer of the defendant represented to plaintiff that he had no claim for damages. Such practice was a fraud, constructive if not actual, upon the plaintiff, if he did in fact have a cause of action and the defendant knew, or ought to have known, that such claim for damages existed." *Baumann v. Hutchinson,* 124 Neb. 188, 245 N. W. 596. It may also be said, as it was in

*Atchison, T. & S. F. Ry. Co. v. Cunningham,* 59 Kan. 722, 727, 54 P. 1055, 1057: "Taking the testimony offered by the defendant in its most favorable aspect, the settlement was made at such a time, under such conditions, and on such terms that condemn it as a fraud and imposition."

It is our opinion, therefore, that the question of validity of the release, of which there was legally sufficient evidence of fraud in its procurement, was one of fact for the jury, fairly submitted under the granted instructions of the court.

If there had been no evidence of negligence on the part of the taxicab driver, the Western Maryland Dairy Corporation, Zeller, and Rubinstein could not have claimed the benefit of the release to the cab company, as they would not have been joint tort-feasors. *Elling v. Travers,* 162 Md. 597, 605, 160 A. 789. Nor would they be in any better position if the so called release be tainted with fraud or obtained under such circumstances as to amount to duress or imposition.

The defendant Peerless Cab, Inc., in addition to one exception (sixteenth) to all adverse rulings on the prayers, reserved fifteen exceptions on the evidence, but only five, the eighth to twelfth, were discussed in the brief and argued at the hearing of this appeal. The eighth was an exception to a question, on cross-examination, to Kaiss, who was asked if he had interviewed any doctors before getting plaintiff's statement. A useless question, in view of the evidence already given by the plaintiff, but harmless, even if not admissible. The ninth was to a question on cross-examination, "Did you interview any of the Sisters to find out if you had a right to go in to see anybody in the operating room?" This question was clearly inadmissible; this is Mrs. Brown's case—not Miss Mayson's—but in view of the clear-cut issues of the defendant's negligence and the validity of a release to it, a reversal cannot be granted for such a trifling reason.

With regard to the tenth exception, the witness Kaiss had been asked, "Didn't you know, when you gave her

five dollars and she signed this paper, that she was signing away her rights against the other company involved in that accident?" to which he answered, "Yes, certainly." He was then asked, "Did you explain that to her?" When his counsel objected, the objection was overruled and the exception taken. Her ignorance of the effect of the release would not have excused her, unless the circumstances were such that an intelligent person would also have been responsible for her act, and we have here said that the circumstances were such as to leave the question of fraud to the jury. But even if the question had been objectionable, it lost its sting from the answer and the next two questions and answers, which were: "Yes, I explained to her it was a release and she was releasing the Peerless Cab. Q. Did you explain to her she was releasing everybody in the accident? A. I told her a release released everybody. Q. Oh, did you tell her that? Did you tell her she released the truck company, too? A. Well, I didn't make it specific to tell her exactly what the release was, I said, 'This is a release for the injuries claimed, against anything that might arise.' "

At this point the court took over the cross-examination, the subject of the next two exceptions (11 and 12), from which it was brought out that the witness Kaiss had graduated the June before at a law school, and that he knew that a release of one joint tort-feasor was a release to all. The court's questions were simply emphatic repetitions of what had already been asked the witness in respect to the statements made by him to the plaintiff of the meaning and effect of her release. The questions excepted to could have no other inference than the court's opinion of what he thought the witness should have told her before inducing or allowing her to sign a release. For instance, "You knew that the legal effect of permitting her to sign this paper was to deprive her of the right to prosecute her claim against the truck company (Western Maryland Dairy), which she thought, perhaps mistakenly (I have no opinion on that, it is not my busi-

ness to have any) but which she thought and which she had told you was responsible for the accident? Is that question too involved?" The witness answered that it was "rather involved," and the court then said: "I will try to get at that a little more clearly, and in re-stating I wish to repeat, first that I am expressing no opinion whatever of my own; I have no opinion on that. That's a question for the jury to decide in due course of time. Perhaps nobody is responsible legally for this accident." Then followed several leading questions by the court, along the line already indicated. At the conclusion of the questioning of the witness by the court, court and counsel adjourned to the ante-room, where the discussion was opened by the court, who said: "That he wishes it noted specially in the record at this point that the questions asked of the witness were asked by the court in a low tone of voice, lower than the court's ordinary tone in conversing; that they were asked without the slightest suspicion of emotion; and the court now proposes to inquire of each of the counsel in the case whether this appraisal of the court of his own behavior is correct or incorrect," to which both attorneys for the plaintiff said, "Correct," one of the counsel for the dairy corporation said, "Absolutely correct," and the other said, "Satisfactory to me your honor." Counsel for the Peerless Cab and Rubinstein demurred, saying that "the court evidenced an attitude of temper upon hearing the witness testify that he would go to a hospital to interview an injured party other than the plaintiff in this case before making known his mission, and before inquiring at the hospital of the injured's condition," and "that counsel for the defendants Rubinstein and Peerless Cab feels his clients' interests have been unduly prejudiced by this attitude on the part of the court." At the conclusion of the conference, court and counsel returned to the courtroom, where a motion was made to withdraw a juror and declare a mistrial, which was overruled, and an exception noted.

"The judge," according to 64 *C. J.* 66, "should confine the trial to the issues presented, excluding irrelevant matters and extraneous influences or considerations, and he must conduct the proceedings on some consistent theory, on practical lines, and rule in accordance with his best judgment on every question raised which is pertinent to the issues. It is also his duty to give a case such direction as will prevent a result inconsistent with the law." Or, as said in *Norfolk & W. Ry. Co. v. Hauser,* (C. C. A.) 211 Fed. 567, 572: "The trial judge is primarily responsible for the just outcome of a trial. He is not a mere moderator of a town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who stands charged with full responsibility." His attitude, however, should be, as between the parties, one of strict impartiality, and he should make no remark or comment which would tend to emphasize or minimize the value, weight, or effect of evidence. 64 *C. J.* 99, 102. Ordinarily, a caution to the jury that it should disregard any expression of opinion by the court, and the advice to them that they are the judges of all questions of fact, will be sufficient unless, as sometimes happens, the admonition is worse than the offense.

The questions asked by the court appear to us to have been wholly unnecessary, as the witness had been permitted over objection to testify to substantially the same facts elicited by the court, and the jury knew all the circumstances under which the release had been executed by the plaintiff. But counsel for the Peerless Cab objects not so much to the questions, as to the court's manner in asking them. The dairy company was as much interested in sustaining the release as the other defendants, perhaps more, because it was in a collision wherein its employee had violated the rule of the road in not yielding the right of way to the taxicab, yet its counsel not only did not ask for a mistrial because of any prejudicial attitude or remarks by the judge, but expressly

disclaimed any such conduct on his part, which leaves the vote between the defendants' counsel a tie. In our opinion the court's questioning was unnecessary to the ascertainment of the truth, which should be the aim of court and counsel alike, and amounted only to repetition of facts already before the jury. It may have emphasized the facts and circumstances under which the release was obtained, but not, in the opinion of this court, sufficiently to warrant another trial.

*Judgment affirmed in Nos. 2 and 3, with costs to the appellee.*