Roland ANDERSON, # 115181, Appellee,

v.

WARDEN, MARYLAND
PENITENTIARY,
Appellant.

Roland ANDERSON, # 115181,
Appellant,

v.

WARDEN, MARYLAND
PENITENTIARY,
Appellee.

Nos. 81–6626, 81–6627.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 5, 1981.

Decided Feb. 9, 1982.

Bruce C. Bereano, Annapolis, Md., for appellee/cross-appellant.

Patricia E. McDonald, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen. of Md., Baltimore, Md., on brief), for appellant/cross-appellee.

Before FIELD, Senior Circuit Judge, and HALL and SPROUSE, Circuit Judges.

K. K. HALL, Circuit Judge:

The State of Maryland appeals from the grant of a writ of habeas corpus issued by the district court setting aside the state court conviction of Roland Anderson because of misconduct on the part of the trial judge. We find that the trial judge committed error and we do not condone what he did. However, the overwhelming evidence supports the conviction, and therefore we find the error harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, we reverse.

Eleanor Davis was a sixty-two year old widow, living alone in Annapolis, Maryland. On the night of April 26, 1970, sometime between the hours of 10:00 p. m. and 2:00 a. m., she was raped and murdered in her bed. Her bloody and battered body was found the next morning by her adult son.

The day after the murder, the police brought Roland Anderson in for questioning. They did not arrest him then, but he agreed to be fingerprinted and he gave the police hair and saliva samples. He and his parents also consented to allow the police to search their home. During the search of the defendant's bedroom, the officers found

a pair of trousers with blood stains and seminal stains on them. When questioned, Anderson admitted having worn those pants on the night of the murder. Also, there were fingerprints and palmprints found inside Mrs. Davis' bathroom window ledge and on her bathtub, which turned out to be the defendant's. By May 8, the police had amassed enough evidence to consider Anderson a prime suspect, and they placed him under arrest.

Anderson signed a written confession after giving a detailed oral account of the crime.[1] He related the following sequence of events: Having entered Mrs. Davis' apartment through the bathroom window,[2] he worked his way through the apartment looking for money. Mrs. Davis woke up while he was in her bedroom and recognized him. He knocked her unconscious with his fist. Then a "funny feeling" came over him and he raped her. When he remembered that she would be able to identify him, he decided to kill her. He searched around and found a hammer and a butcher knife. Returning to the bedroom, he beat her over the head with the hammer, and then, because she was still moaning, he slashed her left wrist with the knife. He left, taking the knife and the hammer, which he put into a brown paper bag and stuffed into the garbage can behind his house.[3]

Item by item, the evidence corroborated the confession as follows:

1. *Confession*: He entered the apartment through the bathroom window.

*Evidence*: His fingerprints and palmprints were found inside the bathroom window ledge and on the bathtub.[4]

2. *Confession*: He searched through the apartment for money.

*Evidence*: Mrs. Davis was an impeccable housekeeper, yet her bureau drawers were found partially open, as if someone had been rummaging through them.

3. *Confession*: Mrs. Davis woke up and recognized him.

*Evidence*: They lived in the same neighborhood.

4. *Confession*: He knocked her unconscious.

*Evidence*: The state's pathologist who testified at trial concluded that Mrs. Davis was raped while she was unconscious.

5. *Confession*: He raped Mrs. Davis.

*Evidence*: The autopsy report noted the presence of semen in Mrs. Davis' vagina. Pubic hairs which were microscopically similar to Mrs. Davis' were found on the trousers Anderson admitted having worn on the night of the crime. Seminal secretions found on the bedsheets and on Anderson's clothing evidenced the pres-

---

1. Anderson was fifteen years old at the time of the crime. Before questioning him, a police officer read him his *Miranda* rights and explained them to him in the presence of his parents. During the explanation, the officer stopped frequently and another officer asked them if they understood what was being said. Once the defendant had been fully advised of his rights, he and his parents signed a waiver of rights form.

   After a couple of hours of questioning, he confessed to the crime. The officer then prepared a written confession and Anderson signed it.

   At trial, Anderson tried to disavow the written confession, claiming that he had only a seventh grade education and could not read what he was signing. His argument has no merit. The questioning agent testified about the oral statement in which the defendant had related the details of the murder. The signed confession was merely that statement reduced to writing. Anderson was able to tell about the

crime even if he could not read many of his words once they were written down.

2. Anderson said that he had gone into Mrs. Davis' apartment through the bathroom window about three months earlier to help her get in when she had locked her keys inside. He said that at that time Mrs. Davis had told him that she was so forgetful about her keys that she had to keep her bathroom window unlocked.

3. These items were never recovered.

4. In disputing his confession, Anderson asserted that his fingerprints were in Mrs. Davis' bathroom because he had gone in through the bathroom window to help her get into her apartment when she had locked herself out about three months earlier. This explanation is patently incredible. No juror could believe that the defendant's fingerprints would have remained on Mrs. Davis' bathtub for three months.

ence of both of their blood groups.[5] The last is a particularly telling point because Mrs. Davis had an uncommon blood type.[6]

6. *Confession* : He hit Mrs. Davis over the head with the hammer.

*Evidence* : The pathologist testified that the murderer had smashed Mrs. Davis'' head with a blunt instrument causing gaping scalp wounds, numerous skull fractures, and bruising of the brain.

7. *Confession* : He slashed her left wrist to kill her.

*Evidence* : Although the pathologist testified that the head injuries alone would have been fatal, the direct cause of Mrs. Davis' death was a deep cut on her left wrist.

8. *Confession* : He found a hammer and a knife, and took them with him when he left.

*Evidence* : Mrs. Davis' son testified that a hammer was missing from his mother's belongings.

In sum, the factual evidence matched the confession so exactly as to remove all reasonable possibility of coincidence.

Nevertheless, the defendant asserted that he was nowhere near the scene of the crime, but that he had been at Phyllis Cook's house on the night of the murder. Ms. Cook and Clinton Roberts both confirmed his story. Roberts testified that he and Anderson had left for Cook's house some time after 9:30 p.m. Although Cook did not know what time they had arrived, she said she knew Anderson had been at her house until 3:00 or 3:30 a. m.

After both sides had rested, the state's attorney told the judge that he thought the alibi witnesses had lied. The judge called Cook and Roberts into his chambers and admonished them about the consequences of perjury, whereupon they both agreed to change their stories. The judge then reconvened court and told the jury that the two alibi witnesses had lied in their earlier testimony and wanted to revise their statements.[7] As the witnesses took the stand again, the judge cautioned them that they were being given one last chance to tell the truth.[8] Roberts then admitted that he could have been mistaken about the time he left Anderson's neighborhood that evening, and conceded that it could have been as late as 10:30 or 11:00 p. m. Cook, in turn, acknowledged that she could not be sure if Anderson had been at her house for the

---

5. Mrs. Davis belonged to blood group B; Anderson belongs to blood group A. According to expert testimony adduced at trial, evidence of a person's blood type can be found in body secretions such as saliva, semen, and vaginal fluids. Thus, the presence of both types in the secretions is easily explained: Anderson's semen could have contributed the type A factor; Mrs. Davis' vaginal discharge could have contributed the type B factor.

6. An expert at trial testified that only 10% of the population belongs to blood group B.

7. The judge said,

Mr. Foreman, ladies and gentlemen of the jury at the conclusion of this case two of the witnesses who testified have indicated to the Court that they told an untruth in their testimony and desire an opportunity to correct that before you ladies and gentlemen before this case concludes. As a matter of law, the Court must afford a witness an opportunity to purge himself or herself of perjury. For that purpose we are recalling these two witnesses to the stand to give them an opportunity to revise their stories to what they are now saying is the correct testimony.

8. To Ms. Cook, in the presence of the jury, the judge said,

You have indicated to the Court that a portion of the testimony that you previously gave under oath in this case was false. The Court now affords you an opportunity to correct that testimony by telling the truth and to purge yourself of the perjury you have committed. This is the last chance you will be given in this trial to tell the truth.

Before Roberts took the stand again, the judge spoke with him, in front of the jury, as follows:

Judge Bowen: At the conclusion of the testimony in this case you indicated to the Court that some portions of the testimony you had given before this jury were false. You asked the Court for an opportunity to purge yourself of this crime by being afforded an opportunity to tell the truth to the jury. This is your opportunity to tell the truth. It is the last one you are going to get in this trial. A. Yes sir.

Judge Bowen: You better make good use of it.

entire time between 1:00 a. m. and 3:00 a. m.

The jury found Anderson guilty. We find no reason to question the validity of that verdict.

Anderson tried to establish an alibi with two witnesses who from the start were not positive about the exact amount of time they had spent with him. All the later testimony did was to emphasize how vague their memories actually were.[9] Furthermore, even if Cook and Roberts had never changed their stories, Anderson's alibi defense would have been unavailing. As we outlined above, the evidence corroborated his confession in every detail. Only the murderer could have given as exact an account of the crime as Anderson did.

In the past, courts have gone to extraordinary lengths in the name of liberty to free guilty people on technicalities. Under the facts of this case, we refuse to adopt that practice. Roland Anderson was found guilty by a jury of his peers. That conviction is supported by a large body of evidence and cannot be impugned by the trial judge's error.

We have considered the other issues Anderson has raised and we find them to be without merit.[10] Accordingly, we reverse the decision of the district court and hold that the petition for a writ of habeas corpus is denied.

REVERSED.

SPROUSE, Circuit Judge, dissenting:

I dissent. It is true that strong circumstantial evidence probative of Anderson's guilt was presented to the jury. It is likewise true that the alibi evidence offered initially and during the post-conviction and habeas corpus proceedings, if believed, was probative of Anderson's innocence. Our task, however, is not to weigh the evidence, but to determine if the trial court's error was of constitutional magnitude. The trial court's actions with respect to the alibi testimony were reconstructed by witnesses during Anderson's habeas corpus and post-conviction proceedings; there is nothing in the record to indicate exactly what transpired in the trial judge's chambers since no transcript of those conversations was prepared. The error occurred in the following manner:

Immediately following the testimony of alibi witnesses Cook and Roberts it appears that the state's attorney approached the bench and the trial judge inquired as to whether he wanted the two witnesses held; the state's attorney replied in the affirmative and the sheriff was directed to take them into custody. Whether the jury was present during this exchange is not clear; the trial transcript does not indicate that it was excused.

Cook and Roberts later testified that following Roberts' cross-examination they were taken from the courtroom and detained elsewhere in the courthouse. Cook testified that the person detaining her, who she believed to be a bailiff, accused her of lying and threatened her with a jail sentence. It is uncertain whether the witnesses then asked to be brought before the trial judge in chambers or whether he ordered them to appear there. In any event, the two witnesses next were taken into the judge's chambers and "given quite a lecture" by the trial judge before returning to the courtroom. The trial judge later stated that at the time Cook and Roberts originally testified it was "obvious" to him that they were lying. There is nothing either in the original trial transcript nor in the record of the habeas corpus proceeding indicating the response of these witnesses to the "lecture".

9. Compare e.g., United States v. Bates, 468 F.2d 1252 (5th Cir. 1972). In Bates, a key witness for the prosecution completely changed his testimony after he had been accused of perjury. Unlike that case, the altered testimony here could better be characterized as a clarification.

10. Anderson claims ineffective assistance of counsel. The only arguable instance of ineffective assistance is counsel's failure to object when the judge commented to the jury about the alibi witnesses' testimony. However, since we hold those acts to have been harmless error, counsel's failure to object can not be faulted.

However, when the Court reconvened, the judge addressed the jury as follows:

Mr. Foreman, ladies and gentlemen of the jury at the conclusion of this case two of the witnesses who testified have indicated to the Court that they told an untruth in their testimony and desire an opportunity to correct that before you ladies and gentlemen before this case concludes. As a matter of law, the Court must afford a witness an opportunity to purge himself or herself of perjury. For that purpose we are recalling these two witnesses to the stand to give them an opportunity to revise their stories to what they are now saying is the correct testimony.

As Ms. Cook prepared to testify, the trial judge told her, in the presence of the jury:

You have indicated to the Court that a portion of the testimony that you previously gave under oath in this case was false. The Court now affords you an opportunity to correct that testimony by telling the truth and to purge yourself of the perjury you have committed. This is the last chance you will be given in this trial to tell the truth.

To Roberts, as he commenced his testimony, the trial judge said:

At the conclusion of the testimony in this case you indicated to the Court that some portions of the testimony you had given before this jury were false. You asked the Court for an opportunity to purge yourself of this crime by being afforded an opportunity to tell the truth to the jury. This is your opportunity to tell the truth. It is the last one you are going to get in this trial.

The majority, although expressly disapproving the trial judge's conduct, characterized it as involving a mere technicality amounting to only harmless error. I disagree. Although there is no Maryland statutory provision regarding the freedom of a state trial judge to comment on the evidence, it is well established that the trial judge should endeavor to maintain an impartial attitude, refrain from unnecessary comment and avoid singling out the testimony of any particular witness for comment. *Maryland Dairy Corp. v. Brown*, 169 Md. 257, 181 A. 468 (1935). Even a federal trial judge, who clearly is empowered to comment on the evidence, must take special care to maintain an appearance of impartiality. *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1935). The purpose of judicial comment is to assist the jury in arriving at a just conclusion; therefore, the judge's comments must be neutral and not be given so as to intimidate the witnesses or otherwise interfere with the ascertainment of truth.

When a trial judge's comments are as emphatic, and as one-sided as in this trial, not only is there a strong possibility that the witnesses might be intimidated, but also that defense counsel might be stifled and the efforts of the defendant in his own behalf be repressed. The trial court here blatantly interfered with Anderson's sixth amendment right to freely present the testimony of two alibi witnesses and openly pressed them to change their testimony. Additionally, Anderson had a fourteenth amendment right to a fair trial, which minimally means a fair and impartial judge and jury. The trial judge's remarks clearly indicated his disbelief of the witnesses' first testimony and unquestionably influenced the jury's appraisal of their credibility. The jury, having been advised directly that Cook and Roberts had lied and having heard the judge's strong language addressed to the witnesses, could have only come to one conclusion—that the testimony of the witnesses was false and contrived to save Anderson.

The majority opinion concludes that these actions and their effects were harmless error.

An error involving the denial of a federal constitutional right in a state criminal case can be held harmless only if the reviewing court is satisfied beyond a reasonable doubt

that the error did not contribute to the conviction. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). To reach that conclusion, it is necessary not only to review the evidence which came before the jury, but also to evaluate the effect which the improper evidence or proceedings had upon the jury's deliberations.

The evidence probative of guilt included Anderson's fingerprints and palmprints which were found inside the victim's bathroom window ledge and on the bathtub beneath the window, but, as the majority pointed out, Anderson claimed he previously had entered the house through the same window for a legitimate purpose.

It also is true that Anderson confessed. However, he was fifteen years old and had only a seventh grade education at the time the crime was committed. The interrogation began at about 11 p. m. and was not completed until nearly 2 a. m. Although Anderson's parents accompanied him to the police station when he was arrested they soon left, and it was after their departure that Anderson abandoned his earlier strong denials. Also, he repudiated the confession prior to trial, maintaining that he did not remember signing it and that he had been under the influence of drugs at the time of his arrest and interrogation. The officer conducting the interrogation admitted that the confession was essentially in his own words, not Anderson's, and that Anderson had merely agreed with the statements contained therein.

As detailed by the majority opinion, forensic experts testified that negroid head hairs were found on the victim's nightgown and blanket and that a fragment of caucasian pubic hair was found on trousers taken from Anderson's home. On cross-examination, however, the expert admitted that the negroid head hairs were not specifically identifiable as Anderson's; similarly, the pubic hair could not be identified as the victim's. Blood grouping tests on blood and seminal fluid found on Anderson's clothing and the victim's bed covers did not rule him out as the perpetrator of the crime, but neither did they establish him as such.

The alibi testimony from two witnesses was the evidence probative of innocence. The witness Cook testified initially that Anderson arrived at her home early on the evening of the murder and played cards there all night.

The initial testimony of alibi witness Roberts was that on the day of the murder he played baseball and wrestled with Anderson and some other neighborhood boys. He then went home to clean up and eat dinner; later, he met the group, including Anderson, on a corner near his home. Roberts testified that they all stood around on the corner until 9:00 or 9:30 p. m. Then, he and Anderson hitchhiked out to Ms. Cook's house, where they joined a card game which lasted until about 3:30 a. m.

Unfettered by the trial court's impermissible comment the jury could have considered this collage of circumstantial and alibi evidence and, disbelieving the alibi evidence, could have found Anderson guilty. An attack on such a verdict grounded on insufficiency of the evidence would have failed. The very large clink in the process, however, is that the jury did not have a fair opportunity to evaluate the alibi testimony; in light of the conduct and comments of the presiding judge they could have only disbelieved the evidence which was favorable to Anderson. Additionally, they were left with the unmistakable impression that the judge believed the alibi testimony was contrived for the benefit of Anderson. This, of course, inescapably added greater weight to the existing circumstantial evidence probative of guilt.

A reviewing court determining harmless error *vel non* does not merely determine if there was sufficient evidence to convince a jury of guilt beyond a reasonable doubt. The constitutional error is harmless only if the jury would have convicted even in the absence of the error and the reviewing court is able to determine this beyond a reasonable doubt.

I do not believe that a reviewing court in this case can correctly conclude beyond a reasonable doubt that the denial to Anderson of an impartial judge and jury, by the impermissible judicial tainting of the defense alibi evidence, had no effect on the verdict. I agree with the majority that "guilty" people should not be freed on technicalities. It is the tradition of our criminal jurisprudence and constitutional practice, however, that courts go "to extraordinary lengths in the name of liberty to free" the innocent or more correctly, to free those who have not been constitutionally found guilty. The trial judge's conduct in this case, far from representing a mere technical error, demonstrates vividly the reason for our constitutional shields against the abuse of judicial conduct.