Roland ANDERSON, # 115181, Appellee,

v.

WARDEN, MARYLAND PENITENTIARY, Appellant.

Roland ANDERSON, # 115181, Appellant,

v.

WARDEN, MARYLAND PENITENTIARY, Appellee.

Nos. 81–6626, 81–6627.

United States Court of Appeals, Fourth Circuit.

Heard En Banc Oct. 5, 1982.

Decided Dec. 15, 1982.

K.K. Hall, Circuit Judge, dissented with opinion in which Donald Russell, Circuit Judge and Field, Senior Circuit Judge, joined.

Widener, Circuit Judge, dissented with opinion.

---

Bruce C. Bereano, Annapolis, Md., for appellee/cross-appellant.

Patricia E. McDonald, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen. of Md., Baltimore, Md., on brief), for appellant/cross-appellee.

Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges, and FIELD, Senior Circuit Judge, sitting en banc.

SPROUSE, Circuit Judge:

Roland Anderson was found guilty of rape, felony murder and burglary by a jury in the State of Maryland and sentenced to life imprisonment by the state court in 1970. The convictions for rape and burglary were later vacated by a state court applying double jeopardy principles barring multiple punishments, but Anderson remains incarcerated on the felony murder conviction. The United States District Court for the District of Maryland in 1981 granted a writ of habeas corpus to Anderson, finding constitutional error committed by the trial judge in the conduct of Anderson's trial, and the State of Maryland appeals. A divided panel of this court reversed the district court and ordered the case remanded for a denial of the writ of habeas corpus. After an *en banc* hearing, we now affirm the district court. 670 F.2d 1339.

The circumstances of the crime are discussed in the panel opinion and are here only summarized, since it is not the consti-

tutional insufficiency of the evidence that supports the habeas corpus attack, but the egregious conduct of the trial judge.

The victim was a 62-year-old white widow, who lived in the same neighborhood in Annapolis, Maryland, as Anderson. Anderson, at the time of the crime, was a fifteen-year-old black who had reached the seventh grade.

At trial, the state presented strong circumstantial evidence pointing to Anderson as the perpetrator of the crimes, and also a written confession signed by Anderson. Anderson disputed the conclusiveness of the circumstantial evidence, and disavowed the confession; but an alibi comprised practically his entire defense, and if believed would have made it highly unlikely that Anderson had committed the crime. The alibi was presented by Anderson's testimony, and by the testimony of two of Anderson's friends, Phyllis Cook and Clinton Roberts. The gist of the alibi was that Anderson had been visiting Phyllis Cook's house, approximately 10 miles away from the scene of the murder, during the time in which the crime occurred.

During cross-examination of Cook and Roberts, the state's attorney asked both witnesses if they were aware of the penalty of perjury. The trial court instructed Roberts in the presence of the jury that the penalty was 10 years' imprisonment, and that Roberts should bear that in mind in answering questions.

Immediately following the testimony of Cook and Roberts, it appears that the state's attorney approached the bench and the trial judge asked whether the state's attorney wanted witness Roberts held; the state's attorney replied in the affirmative and the sheriff was directed to take Roberts into custody. While the record is unclear, it seems likely that the jury was present in the courtroom during this exchange and possibly saw Roberts (and Cook) taken into custody by the sheriff.

Cook and Roberts testified in post-trial proceedings that following Roberts' cross-examination they were taken from the courtroom and detained elsewhere in the courthouse. Cook testified that a person who she believed to be a bailiff detained her in a small room, accused her of lying, and threatened her with a ten-year jail sentence for perjury. Roberts testified that a policeman took him from the courtroom to a small room with bars, where someone came and talked to him about perjury. The two witnesses were then brought to the judge's chambers and were "given quite a lecture" by the trial judge, who was "upset," concerning the falsity of their testimony. The witnesses then returned to the courtroom and testified a second time. Their response to the "lecture" is not indicated in either the original trial transcript or the record of the habeas corpus proceedings. The defendant was not present in chambers; but the defendant's attorney and the state's attorney were there. The proceedings were not recorded.

Following the conference in chambers, the court reconvened, and the judge addressed the jury as follows:

Mr. Foreman, ladies and gentlemen of the jury, at the conclusion of this case two of the witnesses who testified have indicated to the Court that they told an untruth in their testimony and desire an opportunity to correct that before you ladies and gentlemen before this case concludes. As a matter of law, the Court must afford a witness an opportunity to purge himself or herself of perjury. For that purpose we are recalling these two witnesses to the stand to give them an opportunity to revise their stories to what they are now saying is the correct testimony.

As Cook prepared to testify, the trial judge told her, in the presence of the jury:

You have indicated to the Court that a portion of the testimony that you previously gave under oath in this case was false. The Court now affords you an opportunity to correct that testimony by telling the truth and to purge yourself of the perjury you have committed. This is the last chance you will be given in this trial to tell the truth.

To Roberts, as he commenced his testimony, the trial judge said:

At the conclusion of the testimony in this case you indicated to the Court that some portions of the testimony you had given before this jury were false. You asked the Court for an opportunity to purge yourself of this crime by being afforded an opportunity to tell the truth to the jury. This is your opportunity to tell the truth. It is the last one you are going to get in this trial. . . . You better make good use of it.

The subsequent testimony of Cook and Roberts varied from their original testimony and considerably weakened the alibi.

The trial court's conduct invaded at least two areas of protection to which Anderson was entitled under the Constitution—his sixth amendment right to call witnesses in his behalf, and to the effective assistance of counsel; and his fourteenth amendment right to a fair trial.

 The judge openly and successfully pressed defendant's two key witnesses to change their testimony. This blatantly interfered with Anderson's sixth amendment right to freely present the testimony of the two alibi witnesses. See *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Nor can we ignore the effect of the court's forcefully expressed opinion on defendant's counsel. When a trial judge's comments are as emphatic, and as one-sided as in this trial, not only is there a strong possibility that the witnesses might be intimidated, but also that defense counsel's freedom of action might be stifled. The possibility that the effectiveness of Anderson's assistance of counsel was prejudicially reduced is demonstrated by counsel's failure to object to Anderson's absence while the judge lectured the witnesses in chambers; and by counsel's failure to object and request a mistrial after the judge's improper remarks before the jury.

██ Anderson had a fourteenth amendment due process right to a fair trial, which minimally means a fair and impartial judge and jury. This right was violated. The trial judge's remarks clearly indicated his disbelief of the witnesses' first testimony and unquestionably influenced the jury's appraisal of their credibility. The jury, having been advised directly that Cook and Roberts had lied and having heard the judge's strong language addressed to the witnesses, could have only come to one conclusion—that the initial testimony of the witnesses was false and contrived to save Anderson.

██ Rules governing comments of trial judges during criminal trials do not by themselves determine the due process parameters of fairness. When the fairness of such comments is in issue, however, the doctrine expressed by those rules is illuminating.

██ Although there is no Maryland statutory provision regarding the freedom of a state trial judge to comment on the evidence, it is well established that the trial judge should endeavor to maintain an impartial attitude, refrain from unnecessary comment and avoid singling out the testimony of any particular witness for comment. *Western Maryland Dairy Corp. v. Brown,* 169 Md. 257, 181 A. 468 (1935). Federal trial judges usually are more freely empowered than state judges to comment on the evidence, but they also must take special care to maintain an appearance of impartiality. *Quercia v. United States,* 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). The purpose of judicial comment is to assist the jury in arriving at a just conclusion; therefore, the judge's comments must be neutral and not be given so as to intimidate the witnesses or otherwise interfere with the ascertainment of truth.

"It was for the jury to determine which of the witness' stories would be given credence, or indeed whether the witness would be believed at all. The comments by the trial judge clearly infringed upon the jury's credibility determining process and appellant was thereby deprived of a fair trial." *United States v. Bates,* 468 F.2d 1252, 1255 (5th Cir.1972). *See United States v. Reed,* 414 F.2d 435, 442, (Simpson, J., dissenting), *rev'd en banc,* 421 F.2d 190 (5th Cir.1969).

Maryland acknowledges in its brief that the trial judge's remarks were erroneous, and in argument conceded that the error was of constitutional dimension. The only issue therefore is whether the error was harmless. An error involving the denial of a federal constitutional right in a state criminal case can be held harmless only if the reviewing court is satisfied beyond a reasonable doubt that the error did not contribute to the conviction. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Harm is presumed to have come from the constitutional error, and the state has the "heavy burden" of proving harmlessness beyond a reasonable doubt. *Eberhardt v. Bordenkircher,* 605 F.2d 275, 280 (6th Cir.1979). *See Coles v. Peyton,* 389 F.2d 224 (4th Cir.1968). The *Chapman* test is a "strict" one, *United States v. Jones,* 542 F.2d 186, 213 (4th Cir.1976). Harmless error analysis essentially involves the question of whether the error is but a "small error[] or defect that [has] little, if any, likelihood of having affected the result of the trial." *Eberhart v. Bordenkircher,* 605 F.2d 275, 279 (6th Cir.1979), *quoting Chapman,* 386 U.S. at 22, 87 S.Ct. at 827. Both *Chapman* and a succeeding harmless error case, *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), warn against "giving too much emphasis to 'overwhelming evidence' of guilt," where constitutional error affects substantial rights. *Allison v. Gray,* 603 F.2d 633, 635 (7th Cir. 1979).

In gauging, then, the harmlessness *vel non* of the trial judge's conduct and comments in this case, we look to its reasonably possible effect on the outcome. We must look at the evidence, and the reasonably possible effects of the error on the jury's consideration of that evidence.

In the case *sub judice,* the evidence probative of guilt included Anderson's fingerprints and palmprints which were found inside the victim's bathroom window ledge and on the bathtub beneath the window. However, Anderson claimed he had previously entered the house through the same window for a legitimate purpose.

It also is true that Anderson confessed. However, he was fifteen years old and had only a seventh grade education at the time the crime was committed. His interrogation began at about 11:00 P.M. and was not completed until nearly 2:00 A.M. Although Anderson's parents accompanied him to the police station when he was arrested, they soon left, and it was after their departure that Anderson abandoned his earlier strong denials. Anderson repudiated the confession prior to trial, maintaining that he did not remember signing it and that he had been under the influence of drugs at the time of his arrest and interrogation. The officer conducting the interrogation admitted that the confession was essentially in his own words, not Anderson's, and that Anderson had merely agreed with the statements contained therein. The congruence between the text of the confession and the physical facts is undeniable. However, also undeniable is the interrogating officer's clear admission that the method of interrogation was for the officer to repeatedly describe the homicide in detail, as the physical facts painted it, and then repeatedly ask the defendant if that wasn't how he did it. The trial court in an admissibility hearing on the confession acknowledged that this putting words in the defendant's mouth possibly detracted from the weight of the confession, but did not render it inadmissible. The weight of the congruence of confession and physical facts is thus substantially diminished.

Forensic experts testified that negroid hairs were found on the victim's nightgown and blanket and that a fragment of caucasian pubic hair was found on trousers taken from Anderson's home. On cross-examination, however, the expert admitted that the negroid head hairs were not specifically identifiable as Anderson's; similarly, the pubic hair could not be identified as the victim's. Blood grouping tests on blood and seminal fluid found on Anderson's clothing and the victim's bed covers did not rule him out as the perpetrator of the crime, but neither did they establish him as such.

The alibi testimony from Anderson and his two witnesses was the evidence probative of innocence. The state established that the crime was committed between 10:00 P.M. and 2:00 A.M. Anderson testified to leaving his neighborhood and going to Phyllis Cook's house at about 10:00 P.M. where he visited, played cards and talked until about 3:00 A.M. Phyllis Cook testified initially that Anderson came to her home on the evening of the murder and played cards and talked until approximately 3:00 A.M.

The initial testimony of alibi witness Roberts was that on the day of the murder he played baseball and wrestled with Anderson and some other neighborhood boys. Roberts then went home to clean up and eat dinner; later, he met the group, including Anderson, on a corner near his home. Roberts testified that they all stood around on the corner until 9:00 or 9:30 P.M. Then he and Anderson hitchhiked out to Cook's house, where they ate, played cards and talked until about 3:30 A.M.

After her detention and lecture by the judge, Cook testified that Anderson had not arrived at her house until about 11:45 P.M., and she was unable to say that Anderson was constantly present until 3:00 A.M. Roberts on retaking the stand placed the time of arrival at Cook's at 10:30 or 11:00 P.M., and Roberts stated that he left, without Anderson, at about 1:00 A.M.

At the post-conviction proceedings, Cook testified that she was terrified, and "reworded [her testimony] to satisfy . . . the court and judge . . . so they wouldn't lock me up." She related difficult personal circumstances making her especially vulnerable to threats of imprisonment. Roberts, also worried about imprisonment, said he "was just scared . . . I just would say anything."

■ It cannot be argued that there was not strong evidence probative of Anderson's guilt—there was. The trial judge so dominated the jury's impressions, however, that it is impossible to gauge if the jury could

have observed the fourteenth amendment's command to afford the defendant "due process" while weighing the evidence before them.

The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." *Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933), *quoted* in *United States v. Cisneros,* 491 F.2d 1068, 1074 (5th Cir.1974) (reversing conviction where trial court said "somebody is lying in this case" and indicated who that person was). The judge in the case *sub judice,* by having the witnesses held for perjury and admonishing them in front of the jury, told the jury that the witnesses were lying in their initial testimony and being truthful in their subsequent testimony.

Unfettered by the trial court's impermissible comments, the jury in the instant case could have considered both the strong evidence of guilt and the alibi evidence and, disbelieving the alibi evidence, could have found Anderson guilty. An attack on such a verdict, grounded on the insufficiency of the evidence, would have failed. Likewise, it is in the realm of possibility that the jury disregarded the judge's comments. There is no way, however, short of surmise to reach the latter conclusion. In light of the conduct and comments of the presiding trial judge the opposite is probably true—that the jury was given a strong incentive to wholly discount the evidence favorable to Anderson. Moreover, the improper judicial comment on the defendant's evidence inescapably tended to spill over and to add greater weight to the circumstantial evidence probative of guilt. *Cf. Miller v. North Carolina,* 583 F.2d 701, 708 (4th Cir. 1978).

We cannot conclude beyond a reasonable doubt that the denial to Anderson of an impartial judge and jury, by the impermissible judicial tainting of the defense alibi evidence, had no effect on the verdict.[1]

---

1. "[A]lso inimical to the judicial process . . . [are errors] of encroachment by the judge on the province of the jury, or vice versa. . . .

The trial court's egregious conduct in this case was not harmless. It was in no way a mere technical error. Anderson did not receive the fair trial he was constitutionally entitled to.

The judgment of the district court is affirmed.

AFFIRMED.

K.K. HALL, Circuit Judge, dissenting:

In writing the majority panel opinion in this case, I stated that the trial judge committed harmless error in the manner in which he handled the perjured testimony of the defendant's alibi witnesses. After hearing the en banc argument of counsel and further consultation with my brother judges, I now conclude that I was wrong. The trial judge did not commit any error at all. Under the circumstances, he acted judiciously and properly. Not to have permitted a recall of the offending witnesses after hearing the truth would have been improper conduct on his part. In all other respects, I stand by my published opinion and adopt it as a dissent to the en banc opinion of this Court.

As a further comment on the majority opinion, in my view a majority of this Court has gone beyond the bounds of reason to find a way to reverse the conviction of a murderer. Anyone reading the record in this case cannot reasonably reach any other conclusion but that this defendant is guilty. Setting aside his conviction is an affront to society.

DONALD RUSSELL, Circuit Judge, and FIELD, Senior Circuit Judge, join in this dissent.

WIDENER, Circuit Judge, dissenting:

I join in Judge Hall's dissent, and I would add a word.

When judicial comment has exceeded fair guidance and attempted to lead the jury to a particular verdict, the comment carries a high risk that it influenced the jury. Even a cautionary instruction . . . may not counteract the force of comment attended by the authority of the

The majority correctly notes that the jury could have only come to one conclusion, that the initial testimony of the witnesses was false and contrived to save Anderson. But that was the fault of the witnesses, not of the trial judge. Both the witnesses changed crucial parts of their testimony with respect to Anderson's alibi; the changed testimony concerned times when Anderson was actually with them on the night of the murder.

That they were confessed perjurers is shown beyond any doubt by the following question and answer from the witness Phyllis Cook:

"Q. All right. Now I want you to tell the jury what we discussed in chambers and where if any error you might have made in the testimony that you gave regarding the time of the arrival of this Defendant, who he arrived with and what time he left. Go slowly, but tell the truth.

"A. *Just the part where I lied at.*" (Italics added.)

I think the jury was entitled to hear the changed testimony, and not only was the jury entitled to hear it, the trial court had every right to comment on it, and indeed an obligation to see that its proceeding was not corrupted by admittedly perjured testimony.

Even in the face of the extreme provocation recounted in the various opinions, the trial judge in his instructions to the jury bent over backward to instruct them that his opinion did not govern which testimony they should have believed:

"Anything the Court says about a given witness or a given line of testimony is not meant to say that we think that line ought to be preferred over something that tends to contradict it. That is your job. What we are trying to do is point

judge's office. An appellate court might still find it difficult to believe it highly probable that the comment did not influence the verdict." R. Traynor, The Riddle of Harmless Error 71–72, (1970).

out to you the real decision that is before you in these facts."

\* \* \* \* \* \*

"Now you must consider all of the evidence bearing on whether or not this accused was the person who committed these acts. You are free and you are to consider all the evidence which tends to show that he was not. You are free to believe or disbelieve all or any part of any witnesses' testimony."

I doubt that the remarks of the trial judge now complained of exceeded permissible bounds under rules of state procedure upon the discovery of admittedly perjured, very crucial testimony, much less were outside constitutional limitations as the majority now holds.