CARLA C. MATTHEWS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Matthews v. Commissioner
Docket No. 22211-81
United States Tax Court
T.C. Memo 1989-3; 1989 Tax Ct. Memo LEXIS 3; 56 T.C.M. (CCH) 992; T.C.M. (RIA) 89003; January 4, 1989
Richard D. Allen, Jesse L. Burke III, and Johannes R. Krahmer, for the petitioner. James P. Clancy, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION
*4 PARKER, Judge: Respondent determined a deficiency in petitioner's Federal gift tax for 1970 in the amount of $ 33,159.62. In this proceeding, petitioner claims an overpayment of Federal gift tax in the amount of $ 78,140.33, plus interest of $ 34,316.61, paid for 1970. The principal issue for decision is whether petitioner's execution in 1970 of a trust instrument in which she transferred to a trust her remainder interest in a 1927 Trust constituted a gift that year. If so, there is an issue as to the proper valuation of the amount of that gift. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Carla C. Matthews resided in Wilmington, Delaware at the time of the filing of the petition. On January 4, 1978 petitioner filed a Federal gift tax return with the Philadelphia Service Center for the year 1970. Petitioner [1] was born in 1937 and is one of three adopted children of a wealthy woman, Louisa d'A. Carpenter. The other adopted children are Ronald d'A. Carpenter, deceased,[2] and Sonia C. Tingle (hereinafter referred to as Ronald Carpenter *5 and Mrs. Tingle). In 1927, a trust (the "1927 Trust") had been created in which Louisa d'A. Carpenter (hereinafter "Louisa Carpenter" or "petitioner's mother") received a life income interest. At the time the 1927 Trust was created, the settlor of the trust was R. R. M. Carpenter. Louisa Carpenter was still a minor, and most of the income was paid to R. R. M. Carpenter, her father and guardian; however, after she reached age 25 the net income was paid to her for life. Upon her death, the remainder of this trust was to go to her lawful issue, in equal shares, per stirpes and not per capita, or in default of such issue, to her sister and brothers or their lawful issue. Louisa Carpenter legally adopted the three children as minors, between 1936 and 1942, pursuant to the laws of the State of Delaware. *6 When the children became adults, Louisa Carpenter irrevocably assigned a certain percentage of the income interest that she received under the 1927 Trust to each of her children. Petitioner received a six percent income interest in the 1927 Trust from her mother in the mid-sixties. Petitioner's six percent interest amounted to approximately $ 1,500 per month. Petitioner shared a distant but loving relationship with her mother. Although Louisa Carpenter did not spend much time with her children, the family got together for holidays, including Christmas and Thanksgiving. For the most part petitioner tried to do everything her mother asked of her. One of the few times that petitioner did not obey her mother was when she decided to drop out of school in the eleventh grade. Although her mother disagreed with this decision, her mother went along with it and petitioner continued to live at home. When petitioner left home in 1956 to get married, Louisa Carpenter purchased the house where the couple lived, but sold the house when petitioner's husband died one year later. Petitioner then moved back home and continued to live there until she remarried in 1962. When petitioner remarried, *7 Louisa Carpenter purchased another home for petitioner and her husband. In 1969 or 1970 when petitioner was divorced from her second husband, although petitioner was reluctant to do so, at her mother's request, petitioner sold the house and gave half of the proceeds to her husband. The husband was a policeman, whose salary was apparently less than petitioner's income. Petitioner did not ask for any alimony or child support in her divorce since her mother requested that she not ask for either. After the divorce petitioner and her daughter, Kimberly Van Sant, returned to the family home. For eight years, from 1969 to 1976, petitioner ran a small horse breeding business. During that time petitioner was the one primarily responsible for the decision making in connection with the operation. This responsibility often included reading contracts, but with assistance from others. Beginning in 1967, Louisa Carpenter expressed her concern to her attorney, Richard C. Carvell, about the financial future of her children and grandchildren. Mr. Carvell first began serving as both Louisa Carpenter's attorney and financial advisor in 1951. After Mr. Carvell retired from the active practice *8 of law in 1957, although he continued to represent a few clients, most of his time was spent working for Louisa Carpenter, handling both her business and personal matters. He signed all of Louisa Carpenter's business and personal checks. Mr. Carvell also served as an intermediary between Louisa Carpenter and her children. Louisa Carpenter told her children that Mr. Carvell had authority from her to manage her affairs and that they were to go through Mr. Carvell or Elmer Horsey if they needed anything from her. The adult children often needed and received financial help from their mother. Mr. Carvell helped Louisa Carpenter's son, Ronald Carpenter, with his business endeavors. He also assisted petitioner when she needed financial assistance from her mother. Petitioner would often mail her bills to Mr. Carvell who would arrange for their payment with her mother's funds. Mr. Carvell also personally endorsed a note for petitioner in the amount of $ 500. Beginning in 1964 Elmer Horsey, a certified public accountant, shared an office with Mr. Carvell in Chestertown, Maryland. Mr. Horsey was employed full-time by Nylon Capital Shopping Center, Inc. as its vice president and general *9 manager. Prior to that time, Mr. Horsey did some tax and accounting work for both Louisa Carpenter and Mr. Carvell. Nylon Capital Shopping Center, Inc. was a corporation Mr. Carvell formed for Louisa Carpenter's investment in the shopping center. Louisa Carpenter or a trust set up by or for her owned the corporation, and she controlled the corporation. Mr. Horsey handled some of Louisa Carpenter's business after Mr. Carvell retired. From time to time petitioner would also approach Mr. Horsey if she had financial problems, and Mr. Horsey would intercede with Louisa Carpenter on petitioner's behalf. Louisa Carpenter was afraid that her children would make bad investments with their remainder interests in the 1927 Trust or would be taken advantage of so that nothing would be left for them or their own children. Thus, during the period 1967 to 1969 Louisa Carpenter discussed with Mr. Carvell a transfer of her children's remainder interests in the 1927 Trust to separate newly created trusts for each of her adult children. During the period 1967 to 1970, Mr. Carvell proceeded to draft a separate trust agreement for each adult child. The trust agreements each named one of the children *10 as grantor and conveyed irrevocable income interests in the new trusts to that grantor and that grantor's surviving issue. The trust remainder would then go to the surviving issue of the grantor's children (i.e., petitioner's grandchildren). Louisa Carpenter also discussed with Mr. Carvell the fact that she did not want to pay any Federal gift taxes on behalf of her children on the transfers of her children's remainder interests in the 1927 Trust to the new trusts. Mr. Carvell was also aware that the children themselves could not afford to pay Federal gift taxes on the transfers in 1970. Therefore, after a discussion with an attorney who specialized in Federal gift tax law, Mr. Carvell determined that the imposition of a gift tax might be deferred by delivering the executed trust agreements to a third party rather than to the trustee. This third party would then be given instructions to hold the agreements until Louisa Carpenter's death and then deliver them to the trustee. On December 23, 1969, Mr. Carvell sent a letter to the Wilmington Trust Company, the proposed trustee of each trust, asking that the Trust Company review both the trust agreements and a cover letter that was *11 to be enclosed with each agreement. The cover letter, which was addressed to William Geddes, the president of Wilmington Trust Company, contained instructions for him to act as the third party and retain the trust agreements in Wilmington Trust Company's files until Louisa Carpenter's death. In Wilmington Trust Company's response dated December 29, 1969, the vice president of Wilmington Trust Company, Henry van der Goes, expressed his concern over the effective date of the trusts. Mr. van der Goes stated that if the trusts were delivered to an officer of the Wilmington Trust Company this would be a "distinctly ambiguous situation" and might constitute delivery to the trustee, which would bring the trusts into existence in 1970, with the immediate imposition of a gift tax. In addition, if the delivery to the Trust Company's officer was intended to place the transactions beyond the control of the children, Mr. van der Goes warned that "there might be a basis for a contention by the Government that the transaction had in fact been completed at the time of delivery * * *." Finally, Mr. van der Goes suggested that if the trusts were to be effective immediately upon delivery to the Trust *12 Company's officer, then the rule against perpetuities should run from that date rather than from Louisa Carpenter's death, as was specified in the trust agreements. In response to Mr. van der Goes' reservations, Mr. Carvell wrote to Mr. van der Goes that he was having the children write letters to the president of the Chestertown Bank of Maryland, requesting that the president retain the trust agreements and deliver them to the Wilmington Trust Company immediately following the death of Louisa Carpenter. The Chestertown Bank of Maryland was unrelated to the Wilmington Trust Company. However, Mr. Carvell had once been an attorney for the Chestertown Bank of Maryland and a member of the bank's board of directors. In addition, Louisa Carpenter and Nylon Capital Shopping Center, Inc. had bank accounts at the Chestertown Bank of Maryland. About $ 400,000 flowed through the Nylon Capital Shopping Center, Inc.'s bank account at the Chestertown Bank of Maryland each year. Mr. Carvell often arranged loans from that bank on behalf of Nylon Capital Shopping Center, Inc. Petitioner did not have an account with the Chestertown Bank of Maryland or know anyone who worked at the bank during *13 or prior to the time in issue. Furthermore, petitioner had no income interest or right to make business decisions in Nylon Capital Shopping Center, Inc., which did have an account with the bank, but she was one of the beneficiaries of the trust that owned the corporation. On March 19, 1970, Mr. Carvell's secretary, Katherine Hatcherson (hereinafter referred to as Mrs. Hatcherson), mailed to petitioner, Mrs. Tingle, and Ronald Carpenter copies of the trust agreements. In the cover letters addressed to the three adult children that accompanied the trust agreements, Mr. Carvell noted that he was sending an original and two copies of each trust agreement and requested that they each sign two of the agreements and return them to him. Petitioner's trust agreement, dated April 10, 1970, purports to make a gift from petitioner to her daughter, Kimberly Van Sant, and petitioner's surviving issue of an irrevocable income interest in a trust created from petitioner's remainder interest in the 1927 Trust. Wilmington Trust Company is named as the trustee of the trust. The 1970 Trust states that petitioner, as the trustor, does hereby "now and forever, assign, transfer, convey, set over *14 and deliver all present and future right, title, interest and estate that she may have, whether vested, contingent or in expectancy * * *" in the 1927 Trust. The trustee is directed during the remainder of trustor's life to pay ten percent of the net income of the trust fund to each of the trustor's children as long as they live, with the remaining income to be paid to petitioner. However, if at the time of the death of Louisa Carpenter, Kimberly Van Sant is the only living child of petitioner, then the trustee is to pay Kimberly Van Sant 25 percent of the net income of the trust fund and the remaining income to petitioner. The issue of any deceased child of the trustor is to take per stirpes, in equal shares, the net income of his or her deceased parent. If Kimberly dies leaving issue, her 25 percent of the net income is to be paid to her surviving issue, per stirpes, in equal shares, with the balance of the net income paid over to the trustor. Upon the trustor's death, the principal of the trust is to be divided into equal shares, with one share for each of petitioner's children, be they then-living or then-deceased. There are provisions for payment of net income to then-living *15 children, use of principal for certain limited purposes, withdrawal of certain percentages of principal at certain ages by each child. Also upon the death of each child (either before or after trustor's death), the principal of each child's share is to be paid over as the child may appoint by will, or to each child's then-living issue, per stirpes, in equal shares, or in default of any of the above, to such persons entitled to inherit from the trustor under the intestacy laws of Delaware. The trust is to terminate "twenty-one (21) years after the death of the last survivor of Carla C. Van Sant and the last surviving child of the said Carla C. Van Sant who is living at the time the trust becomes effective on the death of the said Louisa d'A. Carpenter * * *." The trust is deemed to have its situs in Delaware. The trust agreement further provides that "This agreement and the trusts hereby created shall be irrevocable, and not subject to any amendment, alteration or control by Trustor at any time." When petitioner signed the trust agreement, she also signed a letter to the Chestertown Bank of Maryland that was to be used as a cover letter for the trust agreement. This letter was *16 enclosed with the trust agreement that was sent to petitioner by Mr. Carvell's office in Chestertown, Maryland. The cover letter stated that petitioner was enclosing an executed trust agreement and asked that the agreement be retained in the files of the president of the Chestertown Bank until the death of Louisa Carpenter. Petitioner's letter requested that upon Louisa Carpenter's death, the Chestertown Bank deliver the trust agreement to the Wilmington Trust Company for acceptance and execution as the trustee of the trust. These were the only instructions the Chestertown Bank of Maryland received with regard to the safekeeping and delivery of the trust agreement. The Chestertown Bank placed the three trust instruments in a safety deposit box. The only person with whom petitioner discussed the trust agreement before she signed it was Mr. Carvell. She discussed it with him over the phone. Petitioner did not discuss the trust (the "1970 Trust") with her mother, her brother, or sister, but simply signed the agreement as requested by Mr. Carvell. [3] Petitioner would have signed anything that came from Mr. Carvell since she understood that he had the authority to act for her mother, *17 and petitioner did not wish to do anything that might displease her mother. After petitioner signed the trust agreement, she mailed it back to the Chestertown, Maryland office of Mr. Carvell and Mr. Horsey. Petitioner did not again see the trust agreement until after her mother's death in 1976. Mr. Horsey received the agreement and witnessed the trust agreement based on his recognition of petitioner's signature. When he witnessed the trust *18 agreement, the whole trust agreement was attached to the signature page. Petitioner's brother, Ronald Carpenter, did not read the agreement but came to Mr. Horsey's office and signed the agreement in the presence of Mr. Horsey. Mr. Carvell was in Florida at the time the trust agreements arrived at his and Mr. Horsey's office in Chestertown and at the time Mr. Horsey witnessed them. Mr. Carvell did not see the agreements between the time Mrs. Hatcherson mailed the agreements to the children for signature and the time Mr. Horsey witnessed the signatures of the three children. After Mr. Horsey witnessed the trust agreements, Mrs. Hatcherson either mailed all three executed agreements to Mr. Carvell in Florida, or retained them in the Chestertown office to await his return from Florida. In either event, on April 27, 1970, Mr. Carvell wrote to the president of the Chestertown Bank of Maryland, Roger W. Simpkins, and enclosed the cover letters from the three children requesting that the bank hold the three trust agreements. The Chestertown Bank of Maryland did not receive any compensation for holding the trusts, apparently doing this as an accommodation to a wealthy customer, Louisa *19 Carpenter, particularly since Nylon Capital Shopping Center, Inc. had an account at the bank. While the Chestertown Bank of Maryland held the trust agreements, neither petitioner nor her brother or sister attempted to look at the trust agreements or to speak to anyone at the bank until after Louisa Carpenter died. After petitioner signed the trust agreement, the only person with whom she discussed the trust was Mr. Horsey. After Mr. Carvell retired and began spending a lot of time in Florida, Mr. Horsey had become petitioner's confidant. Petitioner sought out Mr. Horsey's advice or assistance and would either call him on the phone, meet him at the office, or meet him at a designated midpoint location. Several months after she signed the 1970 trust agreement, petitioner became concerned about the trust agreement because she was not sure what she had signed. Prior to Louisa Carpenter's death and several months after she signed the trust agreement, petitioner questioned Mr. Horsey about a "trust instrument" that she had signed and tried to describe it to him, but Mr. Horsey did not know what trust she was referring to. Thus, Mr. Horsey could not help petitioner. Between 1973 *20 and February 8, 1976, petitioner's brother, Ronald Carpenter, discussed the terms of the trust with Mr. Horsey many times. Until Ronald Carpenter started questioning the terms of the trust in 1973, he had forgotten that the trust agreement was located at the Chestertown Bank of Maryland. Specifically, Ronald Carpenter wanted to change the fact that his ex-wife would receive ten percent of the income from the 1970 Trust and that the 1970 Trust did not provide for any future children he might have. Mr. Horsey approached Louisa Carpenter on Ronald Carpenter's behalf with regard to a change in the terms of the trust. After speaking with Mr. Horsey, Louisa Carpenter agreed to the changes and requested that Mr. Horsey have Ronald Carpenter speak with Mr. Carvell about making them. Although Ronald Carpenter then spoke with Mr. Carvell, the changes were never made. When Ronald Carpenter later told Mr. Carvell that he wanted to revoke the trust, Mr. Carvell told him that he could not do that. On February 8, 1976, petitioner's mother, Louisa Carpenter, was killed in a plane crash. On February 9, 1976, Ronald Carpenter tried to stop the Chestertown Bank of Maryland from forwarding the *21 trust agreements to the trustee. However, on February 9, 1976, the Chestertown Bank of Maryland, in accordance with its instructions in the children's cover letters dated April 10, 1970, sent the three 1970 trust agreements to the Wilmington Trust Company as the trustee of the trusts. On February 11, 1976, the Wilmington Trust Company acknowledged receipt of the three 1970 trust agreements. On July 21, 1976, petitioner sent a letter to Wilmington Trust Company in which she claimed that the 1970 Trust executed by her was invalid. Her brother sent a similar letter. Petitioner requested an outright distribution of her one-third remainder interest in the 1927 Trust. Petitioner claimed the 1970 Trust was invalid, alleging that she did not voluntarily consent to the execution of the trust agreement and that she was under the impression that she could not have withdrawn the trust agreement after she had signed it and prior to its delivery to the Wilmington Trust Company. On November 15, 1976, the Wilmington Trust Company filed a petition in the Delaware Court of Chancery for the court to provide instructions as to the proper distribution of the 1927 Trust. In her answer in that *22 proceeding, petitioner denied that the 1970 trust instrument had been validly executed or delivered. Petitioner claimed that her execution of the 1970 trust instrument was invalid because she did not have a donative intent, since she was induced by undue influence, duress, coercion and/or mistake, or misrepresentation of fact and law to execute the instrument. A guardian ad litem was appointed by the Chancery Court for petitioner's minor child, Kimberly, and for petitioner's unborn issue. The guardian ad litem filed an answer in the Court of Chancery, taking the position that the 1970 Trust was valid. After extensive pretrial discovery into the facts in the case, the parties entered into a settlement agreement on December 20, 1977, which was approved by the Court of Chancery. Under the terms of this settlement agreement, petitioner established a trust ("New Trust") with the Wilmington Trust Company as trustee. A portion (40 percent) of the assets from petitioner's one-third remainder interest in the 1927 Trust was delivered to the New Trust and the balance (60 percent) of the assets was delivered outright to petitioner. Under the New Trust, during petitioner's lifetime the *23 trustee is to pay Kimberly Van Sant the net income from the trust. If petitioner has other children in addition to Kimberly Van Sant, the trustee will pay seven and one-half percent of the net income to each additional child during his or her life, provided Kimberly Van Sant never receives less than 70 percent of the net income from the trust. Upon the death of any such income beneficiary, the surviving issue of that deceased income beneficiary shall receive that portion per stirpes, and in the absence of surviving issue, that portion is to be divided among the other income beneficiaries. If petitioner should survive all of these income beneficiaries (petitioner's issue and their issue), the income will be paid to petitioner. Upon petitioner's death, the principal of the trust is to be divided among her issue, be they then-living or then-deceased. Thereafter, there are provisions for payment of net income of a living child's share, for use of principal of that child's share, for withdrawal of a portion at various ages of the child, and provision for appointment of the interest. Only if petitioner survives all of her issue and if petitioner's issue die without issue or without *24 effectively appointing their interest to a person other than petitioner would the remaining principal and accumulated interest in the trust revert to petitioner. Under the terms of the settlement in the Court of Chancery, petitioner agreed to be held solely liable for any gift taxes arising out of the 1970 transaction or the New Trust. The settlement stipulated that tax counsel for petitioner would prepare, and petitioner would execute, a Federal gift tax return reporting the transfer of the assets to the New Trust as a taxable gift in the 1970 taxable year. Petitioner reserved the right to file a claim for refund of any gift tax and interest paid on the tax. This settlement was approved by the Court of Chancery on December 20, 1977. On January 4, 1978, respondent received petitioner's Federal gift tax return. Prior to that time petitioner had not filed a gift tax return for 1970. Petitioner valued the gift at $ 400,272.21. This was based on petitioner's calculation that the property transferred to the New Trust was valued at $ 637,021.10 as of December 20, 1977, reduced by the actuarial value of Louisa Carpenter's remaining life estate in the 1927 Trust as of April 10, 1970 amounting *25 to $ 236,748.89, for a total gift of $ 400,272.21. Petitioner then reduced this amount by the specific exemption of $ 30,000 to $ 370,272.21. The total Federal gift tax on $ 370,272.21 was $ 78,140.33. On December 21, 1979, petitioner filed a claim for refund with respondent. Petitioner claimed that she was entitled to a refund of $ 78,140.33 for the gift tax paid and $ 34,316.61 for interest paid, on the ground that she made no taxable gifts during 1970. On June 1, 1981, respondent mailed a statutory notice of deficiency to petitioner. Respondent determined a deficiency in petitioner's Federal gift tax in the amount of $ 33,159.62 for the taxable year 1970, determining that petitioner's gift for the taxable year 1970 amounted to $ 537,714.09 rather than $ 400,272.21. Respondent determined that the value of the gift should be based on the present worth of the gift (petitioner's one-third remainder interest in the 1927 Trust) as of April 10, 1970. The parties agree that if the gift is found to have been made on April 10, 1970 and if any subsequent events must be disregarded, the gift of petitioner's one-third remainder interest in the 1927 Trust is properly valued at $ 537,714.09, *26 as computed by respondent. However, the parties further agree that if the Court finds that a gift was made on April 10, 1970 but subsequent events may be considered, then the gift is valued at $ 400,272.21. In other words, if the amount of the 1970 gift is the value of the assets transferred to the New Trust in 1977, then petitioner's computation of the amount of the gift is correct. OPINION The principal issue in this case is whether petitioner's execution of a trust document in 1970 constituted a gift of her remainder interest (under the 1927 Trust) under section 2501(a)(1). [4] Petitioner presents three arguments as to why a gift was not made in 1970. First, petitioner contends that a gift was not made in 1970 since she did not intend to make a gift at the time she executed the trust. Second, petitioner argues that no gift occurred because no delivery of the gift took place. Third, petitioner argues that her execution of the trust agreement was the result of undue influence and so no taxable gift took place. *27 Under section 2501(a)(1) a tax is imposed on the transfer of property by gift. Section 2511(a) states that the tax will be imposed whether the transfer is made in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible. In order to make a completed gift of an interest in trust, two things are necessary. The grantor must have the intention to make a gift and the grantor must deliver the property by abandoning or relinquishing all dominion and control over the property put in trust. Smith v. Shaughnessy,318 U.S. 176, 181 (1943); Richardson v. Commissioner,126 F.2d 562, 567 (2d Cir. 1942), affg. on this point 39 B.T.A. 927, 932 (1939). In abandoning all dominion and control, the grantor must not be able to revoke the trust or recapture the property in the trust. Smith v. Shaughnessy, supra.
Petitioner first contends that no gift of an interest in trust occurred in 1970 since she did not intend to make a gift in 1970. Petitioner argues that her *28 lack of intent is evident in the language in the trust as well as her conduct at the time she executed the trust. The language in the trust, however, indicates that a present transfer or gift was intended in 1970. The first line of the 1970 Trust states: "THIS AGREEMENT, made this 10th day of April, 1970 * * *." Furthermore, the trust instrument goes on to state: "Trustor now desires to assign, transfer and set over to Trustee all of her right, title, interest and estate whatsoever in the trust created by the aforesaid Declaration of Trust dated September 7, 1927, * * *." The establishment clause of the 1970 Trust also specifies: "Trustor by these presents does hereby, * * * now and forever, assign, transfer, convey, set over and deliver all present and future right, title, interest and estate that she may have, whether vested, contingent or in expectancy, in and to the said trust estate * * *" created by the 1927 Trust. This language clearly indicates that the trust was created on April 10, 1970, when petitioner signed the trust agreement. The 1970 trust agreement also expressly provided that the agreement and the trusts created thereby "shall be irrevocable, and not subject *29 to any amendment, alteration or control by Trustor at any time." By signing the 1970 trust agreement petitioner in 1970 expressed her assent to the terms of the agreement which stated that the trust was created in 1970. Petitioner contends, however, that the clause in the trust designed to prevent a violation of the rule against perpetuities actually established the effective date of the trust. This clause provided that the trust would terminate "twenty-one (21) years after the death of the last survivor of Carla C. Van Sant and the last surviving child of the said Carla C. Van Sant who is living at the time the trust becomes effective on the death of the said Louisa d'A. Carpenter * * *." Petitioner says that the date of death of Louisa Carpenter is the effective date of the trust, not April 10, 1970. The main purpose of this clause, however, was not to provide the effective date of the trust but was to define the date on which the trust terminated for purposes of the rule against perpetuities. Carpenter v. United States,4 Cl. Ct. 705, 714 (1984), affd. without published opinion 790 F.2d 91 (Fed. Cir. 1986). That the clause designed to prevent *30 a violation of the rule against perpetuities would perhaps be ineffective to do so presents no problem in this case. Under Delaware law, which is the law governing the interpretation of the agreement, a provision that violates the rule against perpetuities can be excised and the remaining provisions of the trust are still upheld as valid. Wilmington Trust Co. v. Wilmington Trust Co.,25 Del. Ch. 121, 151-152, 15 A. 2d 153, 167-168 (Ch. Ct. 1940), affd. 26 Del. Ch. 397, 24 A. 2d 309 (Del. 1942). Thus, we agree with the Claims Court in its ruling on Ronald Carpenter's case, that such an oblique reference to the effective date of the trust in this clause does not contradict the overall language in the trust, particularly the establishment clause that indicates that the trust was created in 1970. [5]Carpenter v. United States, supra.
*31 We think the seeming inconsistency between the clause in regard to the rule against perpetuities and the rest of the trust agreement merely reflects Mr. Carvell's attempt to achieve two contradictory objectives when he drafted the 1970 trust agreements. First and foremost, while he and petitioner's mother still exercised some control over petitioner, they wanted petitioner to abandon and relinquish all dominion and control over her remainder interest in the 1927 Trust. The whole purpose of the new trusts in 1970 was to protect these adult children from squandering their remainder interests under the 1927 Trust so that their financial future and that of their children would be secure. Upon Louisa Carpenter's death, petitioner's remainder interest in the 1927 Trust would have become possessory and no incentive would then exist for petitioner to accede to her mother's wishes. Mr. Carvell also sought this same goal with petitioner's brother and sister. When petitioner's brother, Ronald Carpenter, wanted to change certain provisions in his trust agreement, Mr. Carvell told him that he could not revoke the trust agreement. Second, Mr. Carvell wanted, if possible, to defer the payment *32 of the Federal gift tax since petitioner and the other children could not afford to pay the gift tax and Louisa Carpenter did not want to pay the gift tax for her children. Thus, we conclude that to try to achieve these inconsistent goals, Mr. Carvell worded the trust so that by its express terms an immediate transfer took place, but he worded the rule against perpetuities clause so that it could be argued that the transfer was not immediately effective. Petitioner also asserts that she did not intend to make a gift when she executed the trust since she had no knowledge of the actual terms of the 1970 Trust until after her mother's death. Petitioner contends that Mr. Carvell sent her only the last page, or the signature page, of the trust agreement rather than the entire agreement and that she never received Mr. Carvell's cover letter to her specifying that he was sending her the original and two copies of the trust agreement. Although petitioner testified that she never had an opportunity to read the trust document since she did not receive the entire agreement, the evidence does not bear this out. See n.3, supra. Mr. Carvell as well as his secretary, Mrs. Hatcherson, testified *33 under oath in depositions that each of Louisa Carpenter's adult children was sent the entire agreement as well as the accompanying cover letter in the mail. Ronald Carpenter acknowledged that he received in the mail the entire original trust agreement and two copies, but he nonetheless signed it without reading it. In addition, the entire trust agreement was attached to the signature page when Mr. Horsey witnessed petitioner's signature. Between the time petitioner mailed the trust agreement to the office of Mr. Carvell and Mr. Horsey in Chestertown, Maryland, and the time Mr. Horsey witnessed the instrument, Mr. Carvell was in Florida and could not have put the instrument together during that time. Mrs. Hatcherson testified that she did not put the instrument together after it was signed by petitioner. Thus, the Court is satisfied that petitioner received the entire trust agreement and had the opportunity to read the document before executing it and mailing it back to Mr. Carvell's Maryland office. If she did not understand the trust instrument, she could have sought advice as to its meaning. She also could have discussed the trust agreement with Mr. Horsey prior to signing *34 it. Moreover, petitioner candidly admitted she would have signed whatever Mr. Carvell sent her, and she would not have taken the chance of displeasing her mother. Even if petitioner had not read the trust instrument or was not sent the entire agreement, that still would not negate her intent to make a gift. The donor of a gift need not have actually read the instrument, but must only intend to give something away. If a party does not read or understand what he or she signs, that party alone is responsible for his or her own negligence. Upton v. Tribilcock,91 U.S. 45, 50 (1875); Carpenter v. United States, supra,4 Cl. Ct. at 720; Thomas v. Erie Insurance Exchange,229 Md. 332, 182 A. 2d 823, 826 (1962). Thus, petitioner need not have read or even received the entire instrument if she signed it and intended to give away something. In addition, at trial petitioner stated that although she did not receive the entire agreement, she would have signed the trust agreement without reading it even if she had been sent the entire instrument. She was accustomed to signing whatever Mr. Carvell, her mother's authorized representative, *35 told her to sign. Petitioner had the choice of taking the risk of alienating her mother and the potential financial consequences of such an alienation or executing the trust agreement. Petitioner decided to sign the agreement with the intent of making the gift and remaining in her mother's good graces. The record clearly establishes that she would not risk incurring her mother's displeasure, and would do whatever her mother or Mr. Carvell told her to do. Petitioner also complains that she lacked the intent to make the gift since she was induced by fraud or misrepresentations to execute the trust instrument. To prove fraud the following elements must exist: 1) a material representation, 2) which was false, 3) known by the maker to be false or made in reckless indifference to the truth, 4) made with the intent to induce the other party to act, and 5) a misleading of the other party in reliance upon which she acted and was damaged. In re Brandywine Volkswagen, Ltd., 306 A. 2d 24, 27 n. 5 (Del. Super. Ct. 1973), affd. 312 A.2d 632 (Del. 1973); Colandrea v. Colandrea,42 Md. App. 421, 401 A. 2d 480, 484 (1979). *36 The evidence of fraud must be clear and precise. Western Maryland Dairy Corp. v. Brown,169 Md. 257, 181 A. 468, 471 (1935). A mere scintilla of evidence will not be sufficient to prove fraud. Western Maryland Dairy Corp. v. Brown, supra.Petitioner claims that Mr. Carvell telephoned her and told her that Louisa Carpenter was assigning Louisa Carpenter's inheritance under her mother's (petitioner's grandmother's) will to petitioner and under the document petitioner would then assign ten percent of that inheritance to petitioner's child, Kimberly. Petitioner contends that she only signed the trust instrument because she thought it dealt with her mother's interest under the grandmother's will and had nothing to do with petitioner's remainder interest under the 1927 Trust. Mr. Carvell denied that he misled petitioner. Mr. Carvell testified he never misled petitioner's brother about the terms of Ronald Carpenter's 1970 Trust and never intended to mislead petitioner about the trust's terms. Petitioner may have misunderstood the terms of the 1970 trust agreement, but there is no evidence of any fraud or misrepresentation in this case. [6]
*37 In addition to the intent to make a gift, to make a gift of an interest in trust the donor must deliver the gift. In other words, there must be some minimal ritual or ceremonial conduct to indicate a relinquishment or abandonment of dominion and control over the subject matter of the gift. Richardson v. Commissioner, supra. Petitioner contends that no taxable gift was made in 1970 since no delivery of the gift in trust occurred at that time. Delivery of a gift occurs when the donor intends to relinquish all present and future dominion and control over the gift property. Bothe v. Dennie,324 A. 2d 784, 787 (Del. 1974). The evidence must indicate that the donor intended to divest herself of her right to withdraw, revoke or control the instrument. Saltzsieder v. Saltzsieder,219 N.Y. 523, 114 N.E. 856, 858 (1916). Any further possession and control by the donor must be in recognition of the donee's rights in the property. Bothe v. Dennie, supra.The intention of the donor is that which exists at the time of delivery *38 to the third party. Wilcox v. Hardisty,60 Cal. App. 206, 212 P. 633, 635 (1922); see Farmers Bank of State of Delaware v. Howard,258 A. 2d 299, 301 (Del. Ch. 1969), affd. 268 A. 2d 870 (Del. 1970). The intention of anyone other than the donor is irrelevant. Wilcox v. Hardisty, supra.
A gift is incomplete if it is delivered to the donor's agent, solely to hold for the donor until a particular date or occurrence. Richardson v. Commissioner, supra,126 F.2d at 568. However, if the donor delivers the property to a third party, who acts as the donee's (or trustee's) agent, with instructions for that third party to deliver it to the donee (or trustee) and the donor cannot recall the property, then delivery has occurred. Owen v. Commissioner,53 F.2d 329, 332 (9th Cir. 1931), revg. the factual determination of 18 B.T.A. 539 (1929); Londen v. Commissioner,45 T.C. 106, 110 (1965); Wilson v. Bridgforth,108 Miss. 199, 66 So. 524, 528 (1914). *39 All that is necessary for the third party to become the donee's (or trustee's) agent is for the instrument to be deposited with the third party for delivery to the donee (or trustee) without any express or implied reservation by the donor of the right to retake it or otherwise control its use. Meise v. Tayman,222 Md. 426, 160 A. 2d 916, 919-920 (1960); Wilson v. Bridgforth, supra.
In this case petitioner argues that no delivery occurred for two reasons. First, petitioner contends that she never relinquished dominion or control over the trust agreement when the agreement was deposited with the Chestertown Bank of Maryland. Second, petitioner claims that the Chestertown Bank of Maryland was acting as her agent when it accepted the trust agreement. Petitioner's conduct, after executing the trust agreement, did not establish that she maintained any dominion or control over the trust agreement. Although petitioner, several months after executing the trust agreement, became concerned as to what she had signed, she did not attempt to withdraw the instrument from the Chestertown Bank of Maryland or even go to look at the agreement. Petitioner never *40 attempted to contact Mr. Carvell to find out where the instrument was or to ask that the agreement be returned to her. Petitioner also never mentioned the matter to her mother. Although petitioner next argues that the Chestertown Bank of Maryland held the trust agreement as her agent, petitioner's instructions to the Chestertown Bank that accompanied the trust agreement did not indicate that petitioner regarded the Chestertown Bank as her agent. Since petitioner did not expressly reserve the right to amend, revoke, or withdraw the trust agreement, the Chestertown Bank did not become petitioner's agent but instead became the agent of the Wilmington Trust Company (the trustee) until Louisa Carpenter's death. Meise v. Tayman, supra;Wilson v. Bridgforth, supra.
Petitioner argues that the fact that the president of Chestertown Bank of Maryland testified at the trial that he would have given petitioner the trust instrument if she had asked for it before her mother's death indicates that the Chestertown Bank merely intended to hold the trust agreement for petitioner. However, it is the intent of the donor that determines when a gift is delivered. The *41 third-party holder's intent is irrelevant. Also petitioner's inaction over a six-year period speaks louder than the bank president's purely speculative after-the-fact surmises as to what he might have done. In addition, petitioner argues that the extensive planning of the drafter of the trust to devise a plan to defer the gift tax indicates petitioner's intention not to give up dominion or control when she executed the trust agreement. We disagree. At best these efforts to defer gift tax were a secondary concern. The principal concern of Mr. Carvell and Louisa Carpenter was for the children to transfer their remainder interests in the 1927 Trust to the individual 1970 trusts so that their remainder interests would be placed beyond their dominion and control. Petitioner executed the 1970 trust instrument to effectuate such a transfer. The record establishes beyond peradventure that petitioner was not going to risk her mother's displeasure by refusing to do what Mr. Carvell, who was her mother's authorized representative, told her to do in that regard. Again, the intent, belief, or hope of the third party drafter is irrelevant; the drafter's planning to try to defer taxation *42 of the transfer or Louisa Carpenter's desire to avoid having to pay the gift tax on behalf of her children is irrelevant. We find as a fact that petitioner intended to give up all dominion and control over her interest in the 1927 Trust in 1970 and, therefore, delivery occurred at that time. Petitioner's final contention is that she only executed the trust agreement because she was subjected to undue influence by both her mother, Louisa Carpenter, and her mother's attorney, Mr. Carvell. Petitioner claims that she signed the trust agreement because Mr. Carvell threatened her with disinheritance, which she believed and because she was afraid she might lose her income interest from the 1927 Trust and lose the other financial assistance she was receiving from her mother. A finding of undue influence depends on four elements: 1) a person who is subject to influence; 2) an opportunity to exert undue influence; 3) a disposition to exert such influence for an improper purpose; and 4) a result indicating the presence of undue influence. Robert O. v. Ecmel A.,460 A. 2d 1321, 1323 (Del. 1983). *43 The burden of proving undue influence falls upon the party asserting it. Robert O. v. Ecmel A., supra.To constitute undue influence one party must exercise such dominion and control over the other party that the free will of the other party is overpowered. MacKay v. Costigan,179 F.2d 125, 132 (7th Cir. 1950); Carpenter v. United States, supra,4 Cl. Ct. at 718; Ableman v. Katz,481 A. 2d 1114, 1116-1117 (Del. 1984). Generally with undue influence, an advantage is often sought by the one exercising the influence. Kazaras v. Manufacturers Trust Co.,4 A.D. 2d 227, 164 N.Y.S. 2d 211, 220 (1957), affd. 4 N.Y. 2d 930, 175 N.Y.S. 2d 172 (1958). A parent's threat of disinheritance or the withdrawal of financial assistance to an adult child does not constitute undue influence as a matter of law. Kazaras v. Manufacturers Trust Co., supra. To threaten to do what one has a legal right to do is not undue influence or duress. In that case the father created a trust to provide income for his disabled, adult daughter. The trust was one of many instruments that the father *44 had his daughter sign over the years. She signed everything he asked her to sign. She signed because the instruments were of benefit to her and she had no economic choice if she wanted her father's continued support. The trust in question included assets that the father had previously given the daughter, but which remained under his control. Her father provided all of the daughter's living expenses and created the trust so the assets he gave his daughter would never be dissipated. The father in effect told his daughter, "You do as I say or else I shall not help you or yours." 164 N.Y.S. 2d at 218. The daughter also claimed that her father's accountant threatened that she would not receive any more financial assistance if she did not sign the trust. However, the court found that the father was acting out of love and concern for his daughter and her children. The court found that since the daughter chose continued financial assistance and obeyed her father, her execution of the trust was not the result of undue influence. 164 N.Y.S. 2d at 218. Petitioner's case is similar to the one in Kazaras v. Manufacturers Trust Co., supra. Petitioner *45 testified that her mother's attorney, Mr. Carvell, threatened her with disinheritance if she did not sign the agreement and that she feared her mother would refuse her continued financial support if she did not sign the agreement. Even if petitioner's claims of threats were true, which we rather doubt, [7] her mother acted out of love when she sought to protect her adult daughter and daughter's child from squandering or dissipating petitioner's remainder interest in the 1927 Trust. Although Mr. Carvell was merely carrying out Louisa Carpenter's wishes and was not necessarily personally seeking to protect petitioner, he had no evil motive or improper purpose and was not seeking any advantage for himself. He, along with Louisa Carpenter, sought a way to protect petitioner's future interest in the 1927 Trust. In addition, we are satisfied that petitioner's free will was not overpowered. Petitioner never even discussed the trust agreement with her mother, either before signing it or during the next six years preceding her mother's death. Since petitioner received the trust agreement in the mail, she had time to seek out her own counsel before signing the agreement. Instead, petitioner *46 simply signed the agreement and returned it to Mr. Carvell's office. Petitioner had the choice to either risk the loss of present and future financial support from her mother or sign the trust agreement her mother wished her to sign. Petitioner was 33 years old at the time she signed the agreement. She had been in charge of a horse breeding business for a couple of years at that time. She understood the import of contracts, having dealt with them in her horse business, albeit with counsel and advice from others. However, petitioner argues that at the time she signed the 1970 trust agreement she was at a particularly vulnerable point since she was going through a painful divorce. Petitioner had been married twice, and in each instance her mother had purchased a home for her and her husband. If anything, this demonstrates the mother's genuine concern for the financial future *47 of her daughter and why the mother wished petitioner to execute the 1970 trust agreement to protect her remainder interest under the 1927 Trust against improvident investments or other unwise actions in the future. Petitioner never explained why the divorce made her particularly vulnerable to her mother's requests and concerns for her future. Instead, petitioner made her choice and readily signed the trust agreement, without asking very many, if any, questions about what she was signing. Thus, we conclude that petitioner in 1970 made a taxable gift of her remainder interest in the 1927 Trust. The final issue is the determination of the value of the 1970 gift. Petitioner maintains that the amount of the 1970 gift is limited to the value of the assets contributed to the 1977 New Trust, which was created as part of the settlement of the Delaware Court of Chancery action. Petitioner thus contends that the assets in the New Trust must be valued as of December 20, 1977, and then reduced by the actuarial value of Louisa Carpenter's remaining life estate in the 1927 Trust as of April 10, 1970. In the alternative, petitioner contends that if the taxable gift is the assets transferred *48 to the 1970 Trust valued as of 1970, nonetheless subsequent events, including the settlement of the Delaware Court of Chancery action and the execution of the New Trust in 1977, should be considered in determining the value of the gift. This seems to be just another way of arguing that the 1970 gift is limited to that portion of the assets transferred to the New Trust in 1977. Respondent maintains that the gift of petitioner's remainder interest in the 1927 Trust must be valued at the date of the initial transfer, April 10, 1970, and that subsequent events should not be considered. The parties have stipulated that if petitioner's remainder interest in the 1927 Trust transferred in 1970 by petitioner must be valued as of April 10, 1970 and if subsequent events may not be considered, respondent's valuation of the gift at $ 537,714.09 is correct. [8]
Section 2501(a) imposes a gift tax on the amount *49 of the gift when the donor makes a gift. Under section 2512(a) the value of the gift at the date of the transfer is considered the amount of the gift. Goodman v. Commissioner,156 F.2d 218, 219 (2d Cir. 1946), affg. 4 T.C. 191 (1944). In determining the value of the gift, respondent's calculations are presumed correct and petitioner has the burden to prove that the respondent's valuation method was incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933); Carpenter v. United States,7 Cl. Ct. 732, 736 (1985), affd. without published opinion 790 F.2d 91 (Fed. Cir. 1986). Petitioner contends that since no transfer was actually made in 1970, the gift should be the property actually transferred in 1977 valued when the property was actually transferred in 1977. Petitioner argues that her case is analogous to City Bank Farmers Trust Co. v. Hoey,101 F.2d 9, 10 (2d Cir. 1939). There a court ordered the committee for an incompetent to make payments to the incompetent's daughter. That order was made before the gift tax law went into effect, but the gift was found not to have been completed *50 until the property was actually transferred in a subsequent year after the gift tax law was in effect. However, that case does not assist petitioner since it deals only with the issue as to when the gift was made. We have found that the gift in the instant case, the gift of petitioner's remainder interest under the 1927 Trust, was made in 1970. Petitioner also refers to Revenue Ruling 69-346, 1969 C.B. 227, in which the taxpayer and her husband executed an agreement stating that if her husband would make provisions for her comfort in a trust to be created under his will, the taxpayer would transfer her one-half interest in their community property to the trust. The agreement specified that the taxpayer would not have to transfer her interest to the trust until the executor completed his administration of the husband's estate. The ruling stated that the taxpayer did not make a gift until the death of her husband since the value of the gift could not be determined until that time. Although both the City Bank Farmers Trust Co. v. Hoey, supra, case and the revenue ruling that petitioner cites did not tax the gift until the property was actually transferred, *51 the issue in both instances was the determination of when the gift was made. In this case we have determined that the gift of petitioner's remainder interest under the 1927 Trust was made on April 10, 1970. Thus, under section 2512(a) the value of that gift is the value on April 10, 1970. Petitioner nonetheless argues that subsequent events, such as the settlement in the Delaware Court of Chancery, should be considered when determining the value of the gift. However, the Supreme Court held in Ithaca Trust Co. v. United States,279 U.S. 151, 155 (1929) that any subsequent events after the gift is made are irrelevant to the determination of the value of the gift. See Carpenter v. United States, supra,7 Cl. Ct. at 738. Again petitioner seems to be arguing about when the gift was made. Petitioner argues that even if the value of the gift as of April 10, 1970 does not take into account any subsequent events, the gift should not include "two contingent interests to which [petitioner ] might have become entitled." Petitioner describes one such contingent interest as "a contingent remainder income interest in the income payable to her issue, if *52 all her issue predeceased her leaving no issue surviving." Petitioner describes the other contingent interest as her estate's "reversionary interest in the trust or trusts which were to be created upon her death, pursuant to * * * the 1970 Trust, which reversionary interest would arise if the remainder interest in the trust vested at a date beyond that required by the Rule Against Perpetuities." The regulations state that in valuing property transferred to a trust in which the donor retains an interest in the property, the value of the gift is the value of the property transferred less the value of the donor's retained interest. Sec. 25.2512-5(a)(1), Gift Tax Regs. With regard to a donor's retained interest, the regulations further provide: (e) If a donor transfers by gift less than his entire interest in property, the gift tax is applicable to the interest transferred. The tax is applicable, for example, to the transfer of an undivided half interest in property, or to the transfer of a life estate when the grantor retains the remainder interest, or vice versa. However, if the donor's *53 retained interest is not susceptible of measurement on the basis of generally accepted valuation principles, the gift tax is applicable to the entire value of the property subject to the gift. Thus, if a donor, aged 65 years, transfers a life estate in property to A, aged 25 years, with remainder to A's issue, or in default of issue, with reversion to the donor, the gift tax will normally be applicable to the entire value of the property. [Emphasis supplied.] Sec. 25.2511-1(e), Gift Tax Regs. Here any contingent remainder income interest petitioner might have would depend on whether petitioner, in 1970 still a relatively young woman of 33, would have any more children, whether her young daughter, Kimberly Van Sant, or any other issue of petitioner would have children, and finally whether Kimberly, Kimberly's children, and any other issue of petitioner and their issue all predeceased petitioner. Such a contingent interest is too remote and speculative to be valued. As to the other contingent interest, a violation of the rule against perpetuities would not invalidate the rest of the trust. There is either no possibility of such a contingent interest or it is entirely too remote *54 and speculative to value. The courts have held that a grantor's contingent reversionary interest in a trust is includable in the gift and subject to the gift tax where the value of that retained interest cannot be valued; in other words the inability of approximating the value of such a retained interest means that the gift tax applies to the entire value of the property. Robinette v. Helvering,318 U.S. 184, 188-189 (1943); Tidemann v. Commissioner,1 T.C. 968, 976 (1943); Carpenter v. United States, supra,7 Cl. Ct. at 737. In view of the difficulty of even approximating the value of petitioner's alleged contingent retained interests, any such remote or speculative interests cannot be deducted from the property subject to the gift tax. Thus, the gift must be valued as of April 10, 1970, subsequent events may not be considered, and the amount of the gift includes the entire value of the property transferred to the 1970 Trust. Accordingly, respondent's valuation of the gift is correct. To reflect the foregoing, Decision will *55 be entered for the respondent.
Footnotes
1. During most of the period in issue, petitioner's legal name was Carla C. Van Sant. ↩
2. Ronald d'A. Carpenter unsuccessfully litigated essentially the same issue as in this case in the United States Claims Court. Carpenter v. United States,4 Cl. Ct. 705 (1984), 7 Cl. Ct. 732, (1985), affd. without published opinion 790 F.2d 91↩ (Fed. Cir. 1986).
3. While petitioner testified that she received only the last page (signature page) of the trust agreement and never had an opportunity to read the entire agreement, the Court did not believe this testimony. The record as a whole establishes that she did get the entire agreement. She may well not have read the agreement. Ronald Carpenter who admitted that he received the original and two copies of the complete agreement did not read it but simply signed his agreement. Upon questioning by the Court, petitioner candidly admitted that even if she had received the entire agreement she would have signed it and returned it to Mr. Carvell as instructed. She too signed what she was asked to sign and frequently did not read what she signed.↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
5. We think the date of death of Louisa Carpenter was the "effective date" not of the creation of the trust but only of the commencement of payments to the income beneficiaries under the trust. In other words, only upon the death of Louisa Carpenter would petitioner's remainder interest in the 1927 Trust vest in possession so that the trustee under the 1970 Trust could obtain actual as opposed to constructive possession of the property constituting the trust fund.↩
6. The Court did not believe petitioner's story that she thought the 1970 Trust related to something under her grandmother's will. Moreover, the grandmother died a couple of years before Louisa Carpenter's death.↩
7. Mr. Carvell denied that he ever threatened petitioner with disinheritance. Mr. Horsey testified at trial that Mr. Carvell did make this threat to petitioner from time to time. However, after Louisa Carpenter's death, Mr. Horsey became petitioner's confidant and was biased in petitioner's favor.↩
8. Respondent's computation properly deducted from the value of petitioner's remainder under the 1927 Trust the amount of petitioner's retained lifetime income interest under the 1970 Trust.↩